1997-NMSC-055

947 P.2d 86

**Timothy REED, Petitioner–Appellee,**

**v.**

**STATE of New Mexico, ex rel., Manuel ORTIZ, Director, Taos County Adult Detention Center, Respondent–Appellant.**

**No. 22749.**

Supreme Court of New Mexico.

Sept. 9, 1997.

Tom Udall, Attorney General, Anthony Tupler, Assistant Attorney General, Santa Fe, for Appellant.

T. Glenn Ellington, Chief Public Defender, Sue Anne Herrmann, Assistant Public Defender, Santa Fe, for Appellee.

Peter Cubra, Richard D. Weiner, Jama Fisk, Albuquerque, for Amicus Curiae New Mexico Chapter of the National Lawyer's Guild.

## OPINION

FRANCHINI, Chief Justice.

1 Timothy Reed filed a petition for writ of habeas corpus to challenge his extradition from New Mexico to Ohio. The district court granted his writ on the grounds that the extradition documents were not in order and Reed was not a fugitive from justice. This case is distinguished from other extradition cases by a unique fact pattern that is supported by compelling evidence. We conclude that the extradition documents are in order. However, we agree with the district court that the conduct of the State of Ohio forced Reed to flee the state under duress, in fear of death or great bodily harm at the hands of government officials. We hold that Reed is not a fugitive from justice and affirm the writ of habeas corpus.

## I. FACTS

2 Timothy Reed—also known as Little Rock Reed—is part Lakota Sioux. In 1982 and 1983 Reed pleaded guilty to one charge of theft of drugs and two charges of aggravated robbery. He was sentenced to concurrent terms of up to 25 years imprisonment. Most of that prison time was spent at the Southern Ohio Correctional Facility, known

as "Lucasville" after the name of the Ohio town where the prison is located.

### A. Reed's Growing National Reputation; Animosity of Prison Officials

3 In Lucasville, Reed became a jailhouse lawyer and "writ writer" who helped other inmates prepare petitions for writs of habeas corpus. He also was an advocate for the rights of incarcerated Native Americans to practice traditional religious beliefs while in prison. The undisputed evidence shows that this advocacy incurred the animosity of prison officials.

4 While in Lucasville Reed wrote several articles on Native American religious rights and other Indian issues. These were published in national periodicals. *See, e.g.*, Little Rock Reed, *The American Indian in the White Man's Prison: A Story of Genocide,* 2(1) J. of Prisoners on Prisons, Fall 1989; Little Rock Reed, *Native American -vs- Anglo Rehabilitation: Contrasting Cultural Perspectives,* 2(2) J. of Prisoners on Prisons, Spring 1990. These articles contained strong criticisms of the treatment of American Indian prisoners by the Ohio Adult Parole Authority (Parole Authority) and the Ohio Department of Rehabilitation and Correction (Ohio Department of Corrections). Though incarcerated in Lucasville, Reed acquired a national reputation as a spokesperson for the rights of American Indian prisoners. He was contacted by scholars and other advocates and was asked to provide materials regarding Native American issues for various conferences.

5 The record shows that Reed was a source of aggravation to Ohio prison officials because of his criticisms of the Ohio prison system. Reed states that he was mistreated in prison and was denied parole in retaliation for his speech activities.

### B. First Parole Rescinded; Threat by Chairman of Parole Authority

6 Reed's supporters petitioned the Parole Authority, urging that he be given parole. In October 1990, Reed was finally granted parole and transferred from Lucasville to a six-week reintegration program at a minimum security prison in Orient, Ohio. Short-

ly before his scheduled release from Orient, Reed was asked to sign a "contract" which was required of all parolees. Reed felt the contract compelled him to waive his constitutional rights so he altered the wording and then signed it.

7 On December 5, 1990, Reed met with the Chairman of the Parole Authority. Reed was informed that his parole was being rescinded because of his refusal to sign the contract as written. Reed testified that at this meeting the Chairman cursed him and said "that I was his property, and that I was going to serve twenty-five actual years in maximum security if he [the Chairman] lives that long to ensure it." The Chairman also stated he did not give a damn about Reed's so-called constitutional rights. Reed was returned to Lucasville.

8 Reed filed a habeas corpus petition in state court challenging the recision of his parole. The district court dismissed the petition and the Ohio Court of Appeals affirmed. *See Reed v. Tate,* 1992 WL 129404 (Ohio Ct.App. June 10, 1992), *aff'g Reed v. Tate,* No. 91 C1–122 (Scioto County, Ohio C.P. Ct. Sept. 18, 1991).

### C. Second Parole

9 Approximately a year and half after his first parole, Reed agreed to sign the parole contract, intending to challenge it later in court. He was released from Lucasville on May 5, 1992 to serve a one-year parole term. Shortly after his release, Reed received permission from his parole officer to travel to South Dakota to participate in the Sun Dance, a Lakota Sioux religious ceremony. Reed took up residence with his mother in Cincinnati, working as director of the Native American Prisoners' Research and Rehabilitation Project (Native American Project) while studying full-time towards a bachelor's degree in criminal justice and Indian affairs.

### D. Continued Advocacy; Warden's Personal Resentment

10 During the time he was on parole, Reed published articles and made speeches about such matters as American Indian religious freedom and alleged offenses by the

Ohio prison system. *See, e.g.,* Little Rock Reed, *Today's Prison Administrators Were Trained by Fascists: And What About Tomorrow?,* Iron House Drum (Native American Prisoners' Rehabilitation Research Project, Villa Hills, Ky.), 2d ed. 1992, at 7.

11 Reed also actively corresponded with various officials of the Ohio Department of Corrections including Arthur Tate, Jr., the warden at Lucasville. In these letters he criticized the void of religious services for Native American prisoners. Reed offered to mediate between the Department and religious organizations who were attempting to fill this void. Some of this correspondence was published in such a way as to favor Reed's point of view at the expense of the integrity of the prison officials. *See, e.g.,* Little Rock Reed, *An Exchange Between the NAPRRP and an Ethnocentric Prisoncrat: Three Letters,* Iron House Drum (Native American Prisoners' Rehabilitation Research Project, Villa Hills, Ky.), 2d ed. 1992, at 3–4 (correspondence between Reed and Tate).

12 In his letters, Reed suggested that warden Tate was unresponsive and insensitive. Tate wrote an angry response to Reed, in a letter dated October 16, 1992. He stated, "I personally resent your continued attacks and attempts to dictate to me the 'specifics' of how [Lucasville's] Native American program must operate." Letter from Arthur Tate, Jr., Warden, Southern Ohio Correctional Facility, to Timothy Reed (Oct. 16, 1992). Reed became concerned that Tate or other officials of the Department of Corrections and the Parole Authority might try to violate his parole because of their objections to his speech activities.

### E. Suppression of Reed's Speech Activities by Parole Authority

13 With his parole officer's permission, Reed made presentations at various conferences such as the 43rd Annual Conference of the Governors' Interstate Indian Council in Utah. At a state-wide gathering of Ohio Indian organizations at Ohio State University, he spoke about the deprivation of religious expression for Native Americans by U.S. prisons in general and by the Ohio Department of Corrections in particular.

14 In September or October 1992, shortly after this last mentioned conference, Reed was summoned to a meeting with his parole officer, Ron Mitchell. According to Reed's uncontradicted testimony, Mitchell said that for the first time in his thirteen-year career he had been personally contacted by the chief of the Parole Authority. As Reed testified:

> He told me that the chief directed him to give me an order not to speak in public again about anything relating to the Ohio Department of Corrections or Parole Authority, and he told me that if I wrote any more articles about the Adult Parole Authority or the Department of Corrections, and if I wrote any more letters to any prison officials in Ohio, my parole would be revoked and I would be returned to the penitentiary.

Reed responded that he would no longer travel or write to prison officials. However, he would continue to speak and publish his writings, and when invited to out-of-town conferences, he would send video-taped presentations.

15 Reed was forced to cancel speaking engagements at several religious conferences including the Annual Conference of the Catholic Committee of Appalachia. He had to forego plans to testify before the United States Senate Select Committee on Indian Affairs. Reed stated that, if he felt concern after warden Tate's expression of personal resentment, he now felt real fear of retaliation after the chief of the Parole Authority suppressed his speech.

### F. Threats by Prison Officials

16 Reed maintained contact with inmates inside Lucasville. They warned him that corrections officials were greatly displeased with Reed's criticism of the prison management. It was from these contacts, according to Reed's uncontroverted testimony, that he learned that prison personnel had expressed an intention to cause him death or great bodily harm if he were ever returned to Lucasville. This further corroborated Reed's fear that he could be subject to retaliation because of his speech activities.

### G. Dispute with Devoto

17 Reed asserts that the opportunity for this retaliation arose from a chain of events

beginning with a minor traffic incident on February 16, 1993. In order to keep an appointment with his counselor, Reed had borrowed a car from Dinah Devoto, a volunteer at the Native American Project where Reed worked. Devoto was a city council member in Villa Hills, Kentucky, just across the border from Cincinnati. Reed bumped into another car on an icy road and was fined $105 by Ohio police. Reed's grandmother paid the fine on April 2, 1993.

18 The accident was minor, but the incident fueled the anger of Dinah Devoto's husband Steve, who apparently begrudged his wife's volunteer work with Native American Project. Steve Devoto had remarked to other people that he would like to severely hurt Reed. The record shows that, in an argument over the phone, Steve Devoto told Reed to stay away from his family and threatened to blow off Reed's head. This statement was witnessed by Devoto's six year old daughter. This argument occurred on March 12, 1993, six weeks before Reed's parole term expired.

19 On the evening of Thursday, March 18, 1993, Reed was served with a summons and complaint. As a result of the telephone argument, Steve Devoto charged Reed with the misdemeanor of "terroristic threatening" in violation of Kentucky law. See Ky.Rev. Stat.Ann. § 508.080(a) (Banks–Baldwin Supp. 1990) (proscribing a threat "to commit any crime likely to result in death or serious physical injury to another person").

20 Reed immediately contacted the Devotos. Dinah prepared an affidavit in which she swore that the misdemeanor charge her husband had filed against Reed was false. She stated that she and Steve had discussed the matter and offered to meet with Reed's parole officer to confirm that the charge was false and that Steve intended to drop the charge. Reed's brother, Matthew Scull, picked up the affidavit from the Devotos early the next morning.

## H. Parole Authority Refuses to Arrange a Preliminary Parole Revocation Hearing

21 Reed called Mitchell on Friday, March 19, 1993, when the parole office opened at

9:00 a.m. Scull witnessed the call and later prepared an affidavit which corroborates Reed's account of the conversation. Reed explained that he had been served the misdemeanor summons and complaint for threatening Steve Devoto's life. He told Mitchell that Steve and Dinah Devoto would verify that the charge was false, that it was actually Steve who had threatened Reed's life, and that Steve intended to withdraw his complaint.

22 Mitchell responded that Reed must report to the parole office on the following Monday morning, March 22, 1993, at 9:00 A.M., at which time he would be arrested. As Reed testified at trial:

I said, "Look, Dinah Devoto and Steve Devoto are ready to come into your office with me. Can we visit you this morning?" He said, "No. I want you to come in Monday morning. You know, I like you, but there's nothing I can do for you. You say your goodbyes to your family and friends. Report here at 9:00 am Monday morning. You're going back to Lucasville."

Reed implored Mitchell to allow him to show evidence of his innocence before deciding to revoke his parole. Reed attempted to read Dinah Devoto's affidavit to Mitchell, but Mitchell refused to hear it. Mitchell told Reed he would have to wait until after he was back in prison before he could present evidence of his innocence to the Ohio Parole Board. As Reed testified, Mitchell "assured me that I was going to have no hearing whatsoever. I was going back to Lucasville without any due process." This last remark is significant because in Morrissey v. Brewer, the United States Supreme Court concluded that before parole can be revoked, due process requires a preliminary hearing to establish whether there is probable cause for revocation. If probable cause is established, a second final hearing is required. See Morrissey v. Brewer, 408 U.S. 471, 485–89, 92 S.Ct. 2593, 2602–04, 33 L.Ed.2d 484 (1972). Ohio adopted these due process requirements in Parker v. Cardwell, 32 Ohio App.2d 193, 289 N.E.2d 382, 385 (1972).

Under Reed's undisputed testimony, Mitchell specifically remarked that there would be no preliminary hearing and that Reed would have to see the Parole Board after he was back in Lucasville. Reed indicated that, as a jailhouse lawyer, he was familiar with the parole revocation process, and implies that he would not have misunderstood Mitchell's comments. Reed believed the Ohio parole officials had no intention of respecting his due process rights because they wanted to suppress his speech activities by returning him to prison as soon as possible.

## I. Futile Attempts to Forestall Arrest and Arrange a Preliminary Revocation Hearing

Between Friday, March 19 and Sunday, March 21 Reed and his supporters made many phone calls in an effort to prevent the revocation of his parole without a proper hearing. Reed asked Dinah Devoto to fax her affidavit to Mitchell and to phone him. In a later affidavit, Devoto recounted her conversation with Mitchell: "[Mitchell] told me that high ranking officials in the adult parole authority hold contempt for Reed because of his writings ... and that for this reason Reed would serve the remaining 7-to-25-year sentence in prison." Dinah Devoto Aff. ¶ 2 (Sept. 28, 1994). Steve Devoto called the regional supervisor of the Parole Authority and, expressing remorse, admitted his misdemeanor complaint was false.

On Sunday, March 21, 1993, Reed went to visit Professor Harold E. Pepinsky, a scholarly associate and advisor with whom he had corresponded since his days in Lucasville. Pepinsky holds a law degree from Harvard and is a professor of Criminal Justice at Indiana University. Pepinsky called Mitchell, reaching him at home. He asked what would happen if Reed did show up to be arrested on Monday morning.

> Mr. Mitchell told me that while he kept Rock waiting outside, he would "call Columbus for instructions." He denied any knowledge of what those instructions would be. Legally, I cannot see what difference that makes. When he told me he would get instructions from Columbus, he effectively promised me that the entire statutory [*Morrissey v. Brewer*] appeal process for Rock on revocation would be bypassed by one phone call, before Rock even had a chance to say anything for himself to the officer.

Pepinsky Aff. ¶ 7 (Sept. 27, 1994). In his efforts to forestall Reed's return to Lucasville, Pepinsky had attempted to contact the governor of Ohio, Ohio legislators, the President of the United States, the U.S. Department of Justice, the F.B.I., and the U.S. Attorney General. All told him that they had no jurisdiction to review the case. He was told that his only recourse was to petition the Parole Authority even though the Authority was the very agency denying Reed's right to due process.

## J. Reed Fears for His Life; Riot at Lucasville

Reed states that he knew by this time that his life was in danger. As he testified, "Lucasville is my coffin." Reed was already aware from his contacts with inmates inside Lucasville that prison officials had made statements that he would receive bodily harm if he were returned to Lucasville.

Reed also testified, "I knew then that I was in serious danger, ah particularly because I also had knowledge of the riot that was about to take place in Lucasville." Through his inmate contacts, Reed had been presented with evidence that warden Tate's policies in Lucasville were fomenting great tension and violence. Reed's contacts told him that Tate had imposed forced integration, placing members of the Black Panthers in the same cell with members of the Aryan Brotherhood. In the past Reed had written to Tate about the increasingly dangerous situation at Lucasville, predicting that the warden's policies would result in a riot. Reed felt certain that if he reported to be arrested by Mitchell he would be returned to Lucasville only to find himself in the middle of a riot.

It appears that Reed had been well informed because a bloody riot occurred at Lucasville on Easter Sunday, April 11, 1993, about three weeks after he was supposed to report to Mitchell. Hostages were taken in a

siege that lasted for eleven days. When it was over eight people were dead, including Dennis Weaver, who, like Reed, was a Native American writ writer and supporter of prisoners' rights.

### K. Reed Flees under Duress; Continued Advocacy

29 Reed did not show up to be arrested at Mitchell's office at 9:00 a.m. on Monday, March 22, 1993. Claiming he was forced to choose between violating parole and being beaten or killed at Lucasville, he fled Ohio. The following day he was declared "a Parole Violator-at-Large."

30 He eventually ended up in Taos, New Mexico, where he found work as a paralegal, writer, and secretary for the Center for Advocacy of Human Rights. Even while avoiding the Ohio authorities, Reed continued to publish and speak out on prison and Native American issues. *See, e.g., The American Indian in the White Man's Prisons: A Story of Genocide* (Little Rock Reed ed., 1993) (an anthology of essays by Reed and others); Little Rock Reed, *Some evidence relating to the Lucasville riot,* Prison News Serv., Sept/Oct. 1994, at 3.

### L. Resolution of Devoto Complaint

31 Steve Devoto did not drop his "terroristic threatening" complaint. On June 29, 1993, about four months after Devoto filed the complaint and Reed left Ohio, Reed was tried in absentia and received a 30-day suspended sentence. *Commonwealth v. Reed,* No. 93-M-01300 (Ky.Dist.Ct. June 29, 1993).

### M. Affidavits Describing Threats Against Reed by Prison Officials

32 Reed continued to correspond with inmates inside Lucasville including John Perotti, another jailhouse lawyer. Perotti, at his own initiative, sent a letter to the Center for Advocacy of Human Rights describing threats by prison officials to cause Reed death or great bodily harm. After Reed was arrested to be extradited, he asked Perotti to memorialize these allegations in a sworn statement. Perotti responded with an affidavit that included the following:

> 2. On [August 6, 1994], I was assaulted by prison guards in retaliation for attempting to distribute an article written by Little Rock (aka Timothy) Reed in which he presented evidence that the prison officials at Lucasville orchestrated the riot in which a number of people were killed in the spring of 1993....
>
> 3. When the prison guards assaulted me as set forth above, they told me that my beating was nothing compared to what Little Rock (aka Timothy) Reed could expect if and when he is returned to the Southern Ohio Correctional Facility.

Perotti Aff. ¶¶ 2–3 (Oct. 3, 1994).

33 Reed obtained similar affidavits from other prisoners. A prisoner named Daniel Cahill, who was being investigated for gang activity, described a conversation with the investigating officer.

> On January 12, 1994, the Investigating officer, Mr. Flick, after reading newspaper articles in my possession, noticed an article pertaining to Timothy Reed (A.K.A. Little Rock). Mr. Flick stated: ... "Reed would not be lucky enough to get out of prison alive if he was returned to the Ohio prison system."

Cahill Aff. (Oct. 28, 1994). Another prisoner, Ahmad 'Abdul–Muqsit, provided a similar affidavit.

> That on at least two (2) separate occasions during the course of the earlier part of this year (i.e. approximately April and May, 1994) I had over heard several know [sic] and unknown administrative officals [sic] of this facility [Lucasville] allude to the fact of Little Rock [sic] life being in jeopardy if he was ever returned to the State of Ohio and custody of the Ohio Department of Rehabilitation and Corrections.

Abdul–Muqsit Aff. ¶ 4 (Oct. 20, 1994). Reed testified that these affidavits "merely confirmed what I already know.... That the prison officials intend to do serious bodily injury or to kill me when I'm returned to Ohio."

### N. Reed is Arrested in New Mexico

34 In late September 1994, the State of Ohio initiated procedures to extradite Reed.

On September 27, 1994, Jill Goldhart, acting chief of the Ohio Parole Authority, executed an Ohio State warrant for the arrest of Reed for violating parole. On the same day she also executed a "Request for Extradition Requisition" asking the Governor of Ohio to petition for the extradition of Reed from New Mexico.

35 The Governor of Ohio, on October 12, 1994, signed a "Request for Interstate Rendition" asking the Governor of New Mexico to issue a warrant on behalf of the State of Ohio for Reed's arrest and return to Ohio. On October 26, 1994, the Governor of New Mexico issued the warrant, and the following day Reed was arrested as a fugitive from justice. A copy of the Governor's warrant was filed in the Taos County District Court on October 28. Three days later Reed appeared in the Taos District Court and informed the court that he wished to challenge the constitutionality of his arrest and would file a petition for writ of habeas corpus.

## O. Reed Seeks Federal Relief

36 While pursuing his habeas corpus petition in the state court, Reed also filed, on November 4, 1994, a pro se civil rights lawsuit in federal district court. Invoking 42 U.S.C. § 1983 (1994), he sought recision of the extradition warrant pending an investigation of his claims that Ohio prison officials intend to cause him death or great bodily harm. The federal court denied Reed's claim, stating that, if Reed's allegations were true, his sole federal remedy was a habeas corpus petition, and this could be pursued only after he had exhausted all his state remedies. *See Reed v. King*, No. CIV–94–1267 MV/LFG, slip op. (D.N.M. Nov. 10, 1994).

## P. Crucial Extradition Documents are Missing

37 Extradition laws require specific documentation before an out-of-state extradition request will be honored. *See* NMSA 1978, § 31–4–3 (1937); 18 U.S.C. § 3182 (1994). Though the record is somewhat muddled on this point, it appears that certain crucial documents were not attached to the Governor's warrant when it was issued on October

26, when it was served on Reed on October 27, and when it was filed in the Taos District Court on October 28. The latest date by which the documents in question could have appeared was November 16, 1994, about two weeks after Reed had been arrested on the Governor's warrant.

38 The missing documents proved that Reed was convicted in 1982 and 1983, was paroled in 1992, and was declared a parole violator-at-large in 1993. Implicit in this controversy is the possibility that these crucial documents may not have been in the possession of the Governor of New Mexico when he issued his warrant for Reed's arrest. He thus could not have relied upon them as the legal justification for his warrant.

## Q. State Habeas Corpus Hearing

39 On November 11, 1994, Reed filed his petition for a writ of habeas corpus raising numerous challenges to the Governor's warrant. Three hearings were held, on December 9 and 23, 1994, and January 4, 1995.

40 During the hearings, the State emphasized that under the United States Supreme Court opinion *Michigan v. Doran* the court was limited to considering only four questions: (1) whether the extradition documents are in order; (2) whether the demanding state has charged the defendant with a crime; (3) whether the defendant is the person named in the extradition request; and (4) whether the defendant is a fugitive. *See Michigan v. Doran*, 439 U.S. 282, 289, 99 S.Ct. 530, 535, 58 L.Ed.2d 521 (1978). The State contended that, under this rule, virtually all Reed's evidence and arguments were beyond the scope of permissible inquiry at an extradition hearing.

41 Relying on its legal argument that most of Reed's evidence was irrelevant, the State did not dispute any facts that Reed's evidence purported to support, nor did it introduce any contrary evidence of its own. The State produced no statement by anyone associated with the Ohio prison system to undermine Reed's claim that Ohio prison officials intended to kill him or cause him great bodily harm. The State presented no witnesses of its own and cross examined only

one of Reed's witnesses, Manuel Ortiz, Director of Taos Adult Detention Center, asking him only to identify Reed and to review each of the extradition documents. There were no challenges to the credibility of any witness or any exhibit. In its proposed findings of fact and conclusions of law, the State offered no findings of fact whatsoever to counter Reed's version of the facts. On appeal, the State specifically declined to refute the arguments of the amicus brief filed by the New Mexico Chapter of the National Lawyer's Guild. In short, no evidence of any kind and no argument whatsoever was offered to contradict Reed's claim that his life would be endangered if he were extradited to Ohio.

42 Applying the four-part *Michigan v. Doran* analysis, the district court found: (a) The extradition documents, on their face, were not in order, because, without the missing crucial documents, there was insufficient legal support for issuing the Governor's warrant. *Reed v. Ortiz,* No. 94–1 CR Misc., 1995 WL 118952, at *4–5 (N.M.Dist.Ct. Jan. 20, 1995). (b) The extradition documents did show that Reed had been charged with a crime in the demanding state. *Id.* at *4. (c) Reed is the same person named in the request for requisition and the Governor's warrant. *Id.* (d) Reed was not a fugitive from justice because the uncontroverted evidence shows that he left Ohio "under duress and under a reasonable fear for his safety and his life." *Id.* at *5–8.

43 On January 20, 1995, the district court granted habeas corpus to Reed and ordered his immediate release. The State timely filed a notice of appeal to this Court. *See* Rule 5–802(G)(1) NMRA 1997 (State's right to appeal grants of habeas); Rule 12–102(A)(4) NMRA 1997 (Supreme Court takes appeals from grants of habeas).

44 We now conclude, under the four *Doran* factors, that the extradition documents are in order, that Reed was charged with a crime in Ohio, and that Reed is the person named in the extradition request. However, we affirm the district court's grant of habeas corpus because Reed is not a fugitive from justice.

## II. STANDARDS OF REVIEW

### A. Abuse of Discretion

45 On appeal, we must determine whether the district court abused its discretion, first, by admitting the challenged evidence, and then by granting Reed's writ of habeas corpus based upon that evidence. The main issues in this case turn on the interplay between law and fact. We must ascertain whether the challenged evidence was properly considered as a matter of law. If we answer that question in the affirmative, then we must assess whether the district court properly applied extradition law to those facts, and whether there is sufficient evidence to logically support the court's legal and factual conclusions.

46 In this case, the district court will have abused its discretion if it admitted improper evidence, if it misinterprets the legal effect of that evidence, or if its conclusions are clearly illogical in light of the evidence. *See State v. Lucero,* 98 N.M. 311, 314, 648 P.2d 350, 353 (Ct.App.1982) (defining abuse of discretion).

### B. De Novo

47 Questions of law or questions of mixed fact and law are generally reviewed de novo by appellate courts. *State v. Attaway,* 1994 NMSC 011, 117 N.M. 141, 144–45, 870 P.2d 103, 106–07; *Duncan v. Kerby,* 1993 NMSC 011, 115 N.M. 344, 347–48, 851 P.2d 466, 469–70. It is the role of appellate courts to say what the law is and how the law should be applied to specific facts; on the other hand, trial courts, as fact gatherers, are usually in a better position to make factual determinations. This means that, when presented with questions that implicate both law and fact, we will look anew at all the evidence and arguments in the record. We do not gather new evidence. Nor can we, when examining a paper and tape-recorded record, arbitrarily dismiss the trial court's assessment of the credibility of witnesses and evidence. But we do apply our own judgment in gleaning the facts from the record, assimilating them into a coherent story, weighing their relevance, and evaluating their legal significance. By the same token,

we will analyze the legal issues without any presumption in favor of the judgment of the court below. *See McNair v. Lend Lease Trucks, Inc.*, 62 F.3d 651, 654 (4th Cir.1995) (assessing evidence); *Wilmington Trust Co. v. Baldwin (In re Van Ostrand's Estate)*, 195 A. 287, 295 (Del.1937) (no new evidence); *Slaughter v. Martin*, 9 Ala.App. 285, 63 So. 689, 690 (1913) (judgment).

## C. Burden of Proof

48 The grant of extradition by the governor of the asylum state "is prima facie evidence that the constitutional and statutory requirements have been met." *Doran*, 439 U.S. at 289, 99 S.Ct. at 535. Implicit in the governor's action is that the four *Doran* requirements have been met: the extradition documents are in order, and the petitioner is charged with a crime in the demanding state, is the person named in the demand, and is a fugitive. *See id.* at 289, 99 S.Ct. at 535. The burden thus shifts to the defendant to prove that at least one of the four *Doran* requirements has not been fulfilled. The defendant must meet a difficult standard—proof beyond a reasonable doubt—in defeating this presumption. *See South Carolina v. Bailey*, 289 U.S. 412, 421–22, 53 S.Ct. 667, 671, 77 L.Ed. 1292 (1933) ("beyond reasonable doubt" standard of proof); *Bazaldua v. Hanrahan*, 92 N.M. 596, 598, 592 P.2d 512, 514 (1979) (same concept).

## D. Credibility of Evidence

49 The rules of evidence do not apply in "[p]roceedings for extradition or rendition." Rule 11–1101(D)(2) NMRA 1997. Extradition hearings are not criminal trials in which the guilt or innocence of the defendant is adjudicated. *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir.1980). The hearing functions simply to ascertain whether the evidence of criminal conduct by the defendant is sufficient to justify extradition. *Id.* Thus, the court may consider unsworn statements of absent witnesses as well as hearsay. It may also consider, as the court did in this case, sworn affidavits based upon personal knowledge. *See id.* (unsworn statements, hearsay); *People ex rel. Strachan v. Colon*, 77 N.Y.2d 499, 568 N.Y.S.2d 895, 898, 571

N.E.2d 65, 68 (1991) (quoting *People ex rel. Little v. Ciuros*, 44 N.Y.2d 825, 406 N.Y.S.2d 449, 449, 377 N.E.2d 980, 981 (1978), and mentioning affidavits as possible evidence of irreparable harm). Of course the court has complete discretion in determining the weight such evidence should be accorded.

50 In this case, the State has not in any way impeached or contradicted Reed's version of the facts. In fact, in its Brief in Chief, the State appears to accept the veracity, if not the relevance, of Reed's evidence: "The court's findings on the fugitivity question are supported by considerable, although improper and irrelevant evidence." Resp't's Br. in Chief at 7.

51 "As a general proposition, unimpeached and uncontradicted sworn testimony must be accepted as true." *State v. Chavez*, 78 N.M. 446, 447, 432 P.2d 411, 412 (1967). This is not an inflexible rule. *See State v. Lovato*, 112 N.M. 517, 521, 817 P.2d 251, 255 (Ct.App.1991) (listing exceptions to the rule); *see also Walton v. State*, 98 Idaho 442, 566 P.2d 765, 768 (1977) (uncontroverted evidence does not automatically mean petitioner has shown absence from demanding state at time of offense). On the other hand, undisputed evidence cannot be arbitrarily rejected. *Ramsey v. United States*, 263 F.2d 805, 807 (9th Cir.1959).

52 The State appears to be arguing that the extradition documents, buttressed by the presumption of their validity, are sufficient to controvert Reed's evidence. *See Walton*, 566 P.2d at 768. We disagree. It is true that, absent any evidence to the contrary, the extradition documents are presumed to establish the four *Doran* requirements. But once the defendant presents evidence that tends to refute any of the *Doran* requirements, the court must resolve the issue upon the evidence presented. *See Walton*, 566 P.2d at 768.

53 The only challenge the State has brought against Reed's evidence is to its admissibility and relevance, not to its veracity or sufficiency. By relying exclusively on its legal argument that the evidence is inadmissible, the State has abdicated any objection to the credibility of the evidence. The

court below found Reed's testimony, witnesses, and exhibits entirely credible. We have exhaustively examined the sufficiency, as opposed to the relevance, of the evidence in a light most favorable to the extradition of Reed. *See Meek v. State*, 262 Ind. 618, 321 N.E.2d 205, 206 (1975). We find nothing that materially challenges the sufficiency of the evidence supporting Reed's version of the facts. Many courts have considered claims similar to Reed's, but few have been faced, as we have, with such a singular fact pattern and such compelling evidence. *See, e.g., Commonwealth ex rel. Mills v. Baldi*, 166 Pa.Super. 321, 70 A.2d 439, 442 (1950) ("There is absolutely no evidence in the case at bar, except relator's own self-serving declarations, that he would be subjected to mob violence or that he would not receive a fair and impartial trial in Tuscallosa County.").

54 We also disagree with the state that the evidence should be excluded on the grounds that it is irrelevant. Our rules of evidence define "Relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 11–401 NMRA 1997. Reed made a prima facie showing that he fled Ohio in fear of death or great bodily harm. As we explain below, this showing is a direct response to the question of whether Reed is a fugitive from justice. Any evidence that illuminated this issue was appropriately admitted by the district court. *See People ex rel. Bowman v. Woods*, 46 Ill.2d 572, 264 N.E.2d 151, 152–53 (1970) (stating that unusual facts established by the accused require closer scrutiny by the court). The court did not abuse its discretion by admitting evidence that tended to make "more probable" Reed's contention that he is a refugee from injustice. *See* Rule 11–401.

## III. LAWS IN QUESTION

55 Extradition law is founded on the Extradition Clause of the U.S. Constitution:

A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

U.S. Const. art. IV, § 2. The language of the Clause is imperative and limits the discretion that the sovereign states might wish to exercise. *Puerto Rico v. Branstad*, 483 U.S. 219, 227, 107 S.Ct. 2802, 2807–08, 97 L.Ed.2d 187 (1987). The purposes of the Clause are to preclude "any state from becoming a sanctuary for fugitives from justice of another state and thus 'balkanize' the administration of criminal justice among the several states" and to enable "each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed." *Doran*, 439 U.S. at 287, 99 S.Ct. at 534.

56 The Extradition Clause, however, does not set forth a specific procedure by which interstate extradition is to be accomplished. The Extradition Act specifies the extradition process. *See* § 3182. It has been little changed since it was first approved in 1793. *California v. Superior Court*, 482 U.S. 400, 406–07, 107 S.Ct. 2433, 2437–38, 96 L.Ed.2d 332 (1987); *Johnson v. Matthews*, 182 F.2d 677, 678–79 (D.C.Cir.1950).

57 The Act describes the documentation required when one state demands a fugitive be returned from another state in which he or she has found asylum. Upon being presented with the proper documents, the executive of the asylum state is required to have the fugitive arrested. The demanding state has thirty days in which to provide an agent to whom the fugitive is to be delivered. Section 3182. Section 3182 is often interpreted as prescribing a "summary" executive procedure. *See Doran*, 439 U.S. at 288, 99 S.Ct. at 534. This means that the governor of the asylum state disposes of the case in a prompt and simple manner, by merely examining whether proper and authentic documentation has been provided by the demanding state. *See Black's Law Dictionary* 1204 (6th ed. 1990) (definition of "summary proceeding"). The Act makes no provision for judicial review or any defenses the defendant might present.

58 Further requirements in the extradition process are found in the Uniform Criminal Extradition Act. 11 U.L.A. 97 (1995). Forty-eight states, including New Mexico and Ohio, have adopted the Uniform Act. *See* NMSA 1978, §§ 31–4–1 to –30 (1937, as amended through 1981); Ohio Rev.Code Ann. §§ 2963.01 to –.29 (Banks–Baldwin 1994 & Supp.1996); 11 U.L.A. 97 (table, Mississippi and South Carolina not listed). This Uniform Act was designed to supplement and conform to the overriding federal constitutional and statutory mandates. *See Coungeris v. Sheahan*, 11 F.3d 726, 728 (7th Cir. 1993); *Wright v. Bourbeau*, 3 Conn.App. 512, 490 A.2d 522, 525 (1985).

59 The imperative nature of the extradition process is reiterated by the New Mexico Uniform Criminal Extradition Act:

[I]t is the duty of the governor of this state to have arrested and delivered up to the executive authority of any other state of the United States any person charged in that state with treason, felony or other crime, who has fled from justice and is found in this state.

Section 31–4–2. Our Uniform Act sets forth in greater detail than the Federal Act the processes and documents necessary in an extradition proceeding. *Compare* § 31–4–3 (form of demand), *with* § 3182 (procedural and documentation requirements).

60 The restrictive nature of the federal laws is somewhat moderated by the Uniform Act which gives the executive some latitude in evaluating the extradition demand. Discretionary language is included in the provision that permits the governor to seek investigative assistance from a prosecuting officer who will report "the situation and circumstances of the person so demanded" and whether that person "ought to be surrendered." Section 31–4–4. Similarly, the governor "shall sign a warrant of arrest" upon determining whether "the demand should be complied with." Section 31–4–7. Executive discretion is also suggested by the rule that "[t]he governor of this state *may* also surrender [any person whose extradition is demanded] even though such person left the demanding state involuntarily." Section 31–4–5 (emphasis added).

61 Furthermore, unlike the federal laws, our Uniform Act provides for the due process and habeas corpus rights of the defendant.

No person arrested upon such warrant shall be delivered over to the agent whom the executive authority demanding him shall have appointed to receive him unless he shall first be taken forthwith before a judge of a court of record in this state, who shall inform him of the demand made for his surrender and of the crime with which he is charged, and that he has the right to demand and procure legal counsel; and if the prisoner or his counsel shall state that he or they desire to test the legality of his arrest, the judge of such court of record shall fix a reasonable time to be allowed him within which to apply for a writ of habeas corpus. When such writ is applied for, notice thereof, and of the time and place of hearing thereon, shall be given to the prosecuting officer of the county in which the arrest is made and in which the accused is in custody, and to the said agent of the demanding state.

Section 31–4–10.

62 The implicit executive discretion and the habeas corpus hearing are not without limits. For example, "[t]he guilt or innocence of the accused as to the crime of which he is charged may not be inquired into by the governor or in any proceeding after the demand for extradition [has] been presented to the governor." Section 31–4–20. These limitations have been further specified by decisions of the United States Supreme Court.

63 While *Michigan v. Doran* expressly describes the *executive* extradition procedure as "summary," it does not explicitly make a similar pronouncement regarding the *judicial* habeas corpus evaluation of an extradition demand. *See Doran*, 439 U.S. at 288, 290, 99 S.Ct. at 534, 536. *Doran* does mention that "[t]he Clause never contemplated that the asylum state was to conduct the kind of preliminary inquiry traditionally intervening between the initial arrest and trial." *Id.* at 288, 99 S.Ct. at 535. We do not believe that the judicial habeas hearing is summary in the same sense as the executive extradition process. To be sure, the habeas

hearing takes place with the least possible delay after the arrest of the defendant, it is an abbreviated version of a full trial, it is interrupted by few dilatory pleas, it dispenses with many formalities such as strict adherence to the rules of evidence, and as dictated by *Michigan v. Doran*, the scope of its inquiry is limited. *See* 439 U.S. at 289, 99 S.Ct. at 535. However, the U.S. Supreme Court did not intend to prevent the defendant from raising defenses to the four criteria listed in *Doran*, to utterly preclude the introduction of evidence beyond the face of the extradition documents, to shield the state from presenting evidence to refute the defendant's defenses, or to so abbreviate the proceeding as to preclude a fair hearing of the defendant's claims.

64 This, in part, is because of the essential nature of a habeas proceeding. While extradition is given mandatory status by the U.S. Constitution, habeas corpus is virtually inviolate: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9. The New Mexico and Ohio Constitutions accord the same deference to habeas corpus. *See* NM Const. art. II, § 7; Ohio Const. art. I, § 8 (Banks–Baldwin 1994). Habeas corpus is one of the most ancient and venerated principles of law, described by Blackstone as "the great and efficacious writ." 3 William Blackstone, *Commentaries* *131. Thus, the U.S. Supreme Court stated that "[i]t must never be forgotten that the writ of habeas corpus is the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired." *Bowen v. Johnston*, 306 U.S. 19, 26, 59 S.Ct. 442, 446, 83 L.Ed. 455 (1939).

65 The right to habeas corpus and the mandatory nature of extradition do not inherently conflict. "The extradition clause is a procedural provision. It does not impinge upon any substantive right of any individual and does not affect any provision of the Constitution or its Amendments protecting such rights." *Johnson v. Matthews*, 182 F.2d at 682. A habeas hearing, on the other hand, concerns a defendant's fundamental rights. It is an equitable proceeding which

commands that the state (or keeper of the body) show the authority under which imprisonment is authorized. *See* Rule 5–802(A) (scope and purpose of writ of habeas corpus); *Caristo v. Sullivan*, 112 N.M. 623, 628, 818 P.2d 401, 406 (1991) (stating that "habeas corpus protects our most basic right of freedom from illegal restraint"). Thus, under our Uniform Criminal Extradition Act, a defendant is provided a habeas corpus hearing to show how the process of extradition has resulted in his or her unconstitutional imprisonment. *See Johnson v. Cox*, 72 N.M. 55, 57, 380 P.2d 199, 201 (1963); *see also* § 31–4–10. The laws of extradition, though they permit only limited judicial review, do not supplant the basic right to the Great Writ. *See Fay v. Noia*, 372 U.S. 391, 399–400, 83 S.Ct. 822, 827–828, 9 L.Ed.2d 837 (1963) (discussing the historical importance of the "Great Writ"), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72, 87–90, 97 S.Ct. 2497, 2506–2508, 53 L.Ed.2d 594 (1977).

## IV. LIMITS TO JURISDICTION OF COURTS OF ASYLUM STATE

### A. Michigan v. Doran: Courts May Review Only Four Questions

66 As we have already mentioned, the scope of judicial review in an extradition habeas hearing was drawn by the United States Supreme Court in *Michigan v. Doran*:

> Once the governor has granted extradition, a court considering release on habeas corpus can do no more than decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive. These are historic facts readily verifiable.

439 U.S. at 289, 99 S.Ct. at 535. Not long after *Doran* was issued, this analysis was adopted in New Mexico. *Bazaldua*, 92 N.M. at 599, 592 P.2d at 514–15.

67 The asylum state has a duty to deliver a properly extradited fugitive to the demanding state. The effect of the four *Doran* criteria is to assure that this duty allows for

only limited discretion on the part of the asylum state. *Branstad,* 483 U.S. at 228, 107 S.Ct. at 2808. On the other hand, there would be no point in asking these four questions if it were not possible for the defendant to raise legitimate defenses to each one. Furthermore, the Supreme Court intended that if one of the four questions is answered in the negative then the defendant cannot be extradited. *Cf. Munsey v. Clough,* 196 U.S. 364, 374, 25 S.Ct. 282, 284, 49 L.Ed. 515 (1905) (suggesting that defendant is not a fugitive from justice and may be discharged if it is conclusively proven that the person was not within demanding state when the crime was committed).

### B. Despite the Restrictions of Michigan v. Doran, Some Review is Contemplated

68 It is simply impossible to make a determination of the four *Doran* factors without making factual findings. The *Doran* court itself stated the four factors "are historic facts readily verifiable." 439 U.S. at 289, 99 S.Ct. at 535. The court of the asylum state has jurisdiction to establish the validity of these facts. *Id.* at 297 n. 7, 99 S.Ct. at 539 n. 7 (Blackmun, J., concurring).

69 Thus, despite proclamations that "the commands of the Extradition Clause are mandatory, and afford no discretion to the executive officers or courts of the asylum State," the U.S. Supreme Court must have intended *some* sort of inquiry when it required courts to verify the four historic facts. *See Branstad,* 483 U.S. at 227, 107 S.Ct. at 2807 (statement that there is no discretion). The Court surely presumed that some defendants would deny that the documents are in order, that they have been charged with no crime, that they are the wrong person, or that they are not a fugitive. Furthermore, there must be circumstances in which these defenses are valid. To conclude otherwise would "render meaningless the guarantee of a habeas corpus hearing and the accompanying right to present evidence against the warrant" under the Uniform Criminal Extradition Act. *Galloway v. Josey,* 507 So.2d 590, 592 (Fla.1987); *see* § 31–4–10.

70 The role of the court in the asylum state, though limited, is not merely clerical or perfunctory, restricted to woodenly and superficially noting whether the proper statements and pieces of paper have been provided. "Since individual circumstances surrounding extradition demands are varied and diverse, the mechanical application of fixed and absolute rules is inappropriate if justice is to be achieved in a particular case." *Wright,* 490 A.2d at 526. Nor are courts in the role of notaries or paper checkers, confirming the apparent propriety and orderliness of the documentation. "To the contrary, in the limited area within which it operates, the judicial authority of the asylum court is undiminished." *Narel v. Liburdi,* 185 Conn. 562, 441 A.2d 177, 180 (1981).

71 The Governor's warrant is accorded presumptive validity. *Doran,* 439 U.S. at 289, 99 S.Ct. at 535. However, like any legal presumption, this one may be rebutted upon a showing of persuasive evidence. *Id.* at 293, 99 S.Ct. at 537 (Blackmun, J., concurring); *State v. Ritter,* 74 Wis.2d 227, 246 N.W.2d 552, 555 (1976) (stating that "governor's warrant is only prima facie valid"). We conclude that some cases may present circumstances so unusual and egregious that the asylum state has no choice but to deny the extradition warrant and grant habeas corpus to the defendant. *See People ex rel. Harris v. Mahoney,* 152 Misc.2d 799, 579 N.Y.S.2d 582, 589 (Sup.Ct.1991) (stating that extradition demands must be respected "[e]xcept in the rarest and most egregious of circumstances"), *aff'd,* 198 A.D.2d 466, 604 N.Y.S.2d 574 (1993); *Little,* 406 N.Y.S.2d 449, 377 N.E.2d at 981 (same concept).

72 With the foregoing principles in mind, we shall apply the *Doran* analysis to the facts of this case. Reed does not dispute that he "is the person named in the request for extradition." *Doran,* 439 U.S. at 289, 99 S.Ct. at 535. We shall analyze the remaining three *Doran* questions.

### V. EXTRADITION DOCUMENTS ON THEIR FACE ARE IN ORDER

73 The executive of the asylum state need not recognize a demand for extradition unless specific documents are provided

by the executive of the demanding state. The federal Extradition Act, § 3182, and our Uniform Criminal Extradition Act, § 31–4–3, itemize the required documents. In evaluating whether the documents comply with these statutes, *Doran* directs the court of the asylum state to verify that the extradition documents are in order "on their face." 439 U.S. at 289, 99 S.Ct. at 535. By limiting the review of this question to the "face" of the documents, the *Doran* court seems to have intended a review only of the language and other markings on the surfaces of the pages without any explanation, modification, or addition from extrinsic facts or evidence. *In re Stoneman*, 146 N.Y.S. 172, 175 (Sur.Ct.1914). Only the appearance of authenticity is required. *Cf. United States v. Gordon*, 901 F.2d 48, 50 (5th Cir.1990) (suggesting facial defect would cause a person looking simply at a document to suspect it was invalid).

 74 When entered into evidence at Reed's habeas hearing, the extradition documents were divided into two groups. The first consisted of the seven pages that were originally served on Reed and filed in Taos District Court in the last days of October 1994. The second group—totaling nine pages—were the missing crucial documents whose whereabouts were uncertain until November 16, 1994.

75 We have meticulously examined Reed's extradition documents in light of the pertinent statutes and conclude that, between the two groups of papers, no statutorily required items were missing. *See generally* § 3182 (listing required documentation); § 31–4–3 (same). Once a Governor's warrant is issued, there is a strong presumption that all the constitutional and statutory requirements have been met. *Bazaldua*, 92 N.M. at 598, 592 P.2d at 514. This presumption can only be refuted by proof beyond a reasonable doubt. *Id.* In this case, it does appear that the documents were somehow disassembled. However, as the trial court stated, "No evidence was presented during any of the hearings as to the usage, availability, or nonavailability of [the second group of] documents at the time the Governor's Warrant was issued." *Reed v. Ortiz*, 1995 WL 118952, at *5; *see also Commonwealth v.*

*Hebert*, 365 Pa.Super. 499, 530 A.2d 422, 423 (1987) (suggesting extradition warrant will be verified unless evidence is presented to rebut regularity of warrant).

76 We also find no harm in the fact that the parties may have been served with incomplete documentation. The missing documents were eventually provided, albeit about two weeks after Reed was arrested. Though this may have caused some inconvenience, it does not seem to have impaired Reed's petition for habeas corpus. *See People v. DeSpain*, 106 Ill.App.3d 934, 62 Ill.Dec. 722, 436 N.E.2d 748, 751 (1982) ("The weight of authority is that deficiencies in the documents supporting the rendition warrant may be satisfied at a later time.").

77 We hold, therefore, that the district court abused its discretion when it concluded that the extradition documents were not in order on their face.

## VI. CHARGED WITH A CRIME IN DEMANDING STATE

 78 Several of the extradition documents are copies of official state records showing that Reed was charged with a crime in Ohio and specifying the statutes under which he was charged. They establish that in 1982 Reed was charged with, pleaded guilty to, and was convicted for Aggravated Robbery in violation of Ohio Rev.Code Ann. § 2911.01 (Page 1982), and Theft of Drugs in violation of Ohio Rev.Code Ann. § 2925.21 (Page 1982) (repealed 1990). Similar statements are made regarding his conviction for Aggravated Robbery in 1983. Copies of official state documents also show that, under Ohio Rev.Code Ann. § 2967.15(C) (Banks–Baldwin 1994), Reed was declared to be a parole violator-at-large. There is no express mention of the Kentucky complaint by Steve Devoto, because it did not concern an offense against the laws of Ohio.

79 Thus, the Governor of New Mexico based his warrant upon the naming of an Ohio law and official documents showing Reed was charged with violating that law. For the purposes of an extradition inquiry, this settles the question of whether Reed has been charged with a crime in the demanding

state. *California v. Superior Court*, 482 U.S. at 409, 107 S.Ct. at 2439 (if the allegations in the extradition documents are accepted as true, then the defendants have been properly charged with a crime under the law of the demanding state, and this ends the inquiry).

80 Reed challenges the extradition documents claiming that he can demonstrate the complaint by Steve Devoto was fraudulent and a miscarriage of justice. Given his earlier convictions, this argument is irrelevant. The "charged with a crime" question does not turn on whether the defendant has committed a new crime while on parole. The inquiry is whether the extradition documents show that the defendant has been charged with any crime whatsoever under the laws of the demanding state.

> Taking the broad definition of "charged with crime" as including the responsibility for crime, the charge would not cease or be merged in the conviction, but would stand until the judgment is satisfied. It would include every person accused, until he should be acquitted, or until the judgment inflicted should be satisfied.

*Hughes v. Pflanz*, 138 F. 980, 983 (6th Cir. 1905). The judgment is not deemed satisfied until the defendant has fulfilled his or her obligation to society. In Reed's case, for purposes of the extradition law, this obligation does not end until his final release after the last day of parole. *See Ex parte Nabors*, 33 N.M. 324, 329, 267 P. 58, 60 (1928) (stating that parole violator may be extradited, not for parole violation per se, but for original crime which has not been fully expiated).

## VII. FUGITIVITY AND DURESS

### A. Fugitivity Defined

81 "Fugitive from justice" has been defined as a person who is charged with a crime against the laws of a state, and who, upon being sought to answer for the crime, leaves that state. *See Nabors*, 33 N.M. at 329–30, 267 P. at 60. This definition dismisses any regard for the person's purpose or motive for leaving the state. *Id.* at 330, 267 P. at 60–61 ("[I]f the person demanded had committed a crime in the demanding state,

and when sought to answer for it had left that state and was found in another, he was a fugitive.").

82 This definition seems to require nothing more than the presence within the asylum state of a person who has been charged with a crime in the demanding state. However, if the courts of the asylum state are limited to so narrow a definition of "fugitive from justice," then any argument on the fugitivity element would be meaningless. Such a definition would require nothing more than a simple two-pronged evaluation: a determination that (1) the defendant is charged with a crime in the demanding state, and (2) is present within the asylum state. *See* 1 Charles E. Torcia, *Wharton's Criminal Procedure* § 97, at 385 (13th ed. 1989) ("[A] fugitive is defined as a person who commits a crime within a state and thereafter leaves the jurisdiction.").

83 The first prong is already addressed by part (b) of the *Doran* analysis which inquires whether the defendant "has been charged with a crime in the demanding state." *Doran*, 439 U.S. at 289, 99 S.Ct. at 535; *see Parks v. Bourbeau*, 193 Conn. 270, 477 A.2d 636, 641 (1984) (suggesting that a finding that defendant was not charged with a crime by the demanding state would have supported claim that he is not a fugitive from justice). Thus, even though the defendant is present at the habeas hearing in the asylum state, it seems that part (d) of the *Doran* analysis requires a nothing more than tautological determination that the defendant is present in the asylum state. *See Doran*, 439 U.S. at 289, 99 S.Ct. at 535. This pointless determination cannot logically be the limit of the *Doran* fugitivity analysis.

84 The U.S. Supreme Court stated long ago:

> One arrested and held as a fugitive from justice is entitled, of right, upon habeas corpus, to question the lawfulness of his arrest and imprisonment, showing by competent evidence, as a ground for his release, that he was not, within the meaning of the Constitution and laws of the United States, a fugitive from the justice of the demanding state, and thereby overcoming

the presumption to the contrary arising from the face of an extradition warrant. *Illinois ex rel. McNichols v. Pease*, 207 U.S. 100, 109, 28 S.Ct. 58, 60, 52 L.Ed. 121 (1907). The very existence of the fugitivity inquiry in *Doran* shows that the Court has not abandoned this position. The U.S. Supreme Court could only have intended that, the other three *Doran* requirements notwithstanding, the defendant may not be a fugitive from justice. In other words, there must be some circumstances, however rare, that defeat the mere presence of the defendant in the asylum state as a test of fugitivity. *See Carpenter v. Jamerson*, 69 Ohio St.2d 308, 432 N.E.2d 177, 180–81 (1982) (implying that defendant could conceivably rebut "by proof beyond a reasonable doubt the presumption attached to the governor's warrant that he is a fugitive from justice"). In this case, we conclude that, because he was forced by the conduct of government officials to flee the State of Ohio, Reed's mere presence in New Mexico does not render him a fugitive from justice.

85 One of the few defenses to the fugitivity element that has been successful is proof that the accused was not "present in the demanding state at the time of the commission of the alleged crime." Section 31–4–3; *see Galloway*, 507 So.2d at 593 (discussing this defense). The burden of proof on the accused is substantial. The evidence must be not only clear and convincing, but uncontradicted and proven beyond a reasonable doubt. *See Munsey*, 196 U.S. at 375, 25 S.Ct. at 285 (stating "merely contradictory evidence on the subject of presence in or absence from the state" is not sufficient); *United States ex rel. Vitiello v. Flood*, 374 F.2d 554, 558 (2d Cir.1967) (defendant "must conclusively establish his absence by clear and convincing proof"). Such a determination requires an investigation that goes well beyond the face of the extradition documents. *South Carolina v. Bailey*, 289 U.S. at 418, 53 S.Ct. at 670 (suggesting defendant's story about not being a fugitive "should have been subjected to rigid scrutiny" and the judge should have "demanded that the prisoner present himself for examination [and] show what effort had been made to secure the presence of important witnesses"). To meet the burden of proof the defendant must offer the testimony and affidavits—much as Reed did in this case—of witnesses who can establish the defendant's whereabouts at the time of the crime. *Pakulski v. Hickey*, 731 F.2d 382, 389 (6th Cir.1984) (discussing a hearing that included "the testimony of thirty or more witnesses and … a number of affidavits"). This line of cases shows that defenses to the fugitivity question may require significant factfinding at the habeas hearing.

86 The focus of our analysis is whether Reed is a "fugitive from justice"; in other words, whether he seeks to avoid the maintenance and administration of what is just. The facts demonstrate conclusively that Ohio's conduct toward Reed was not just. Reed is thus not a fugitive from justice. Rather, he is a refugee from injustice.

**B. The Revocation of Reed's Parole**

87 The most troubling aspect of this entire case is that Ohio seeks Reed's return for a violation that Ohio, through its agents, provoked by its own actions. The reason Ohio seeks Reed's extradition is because he is a parole violator-at-large. Reed violated parole by choosing to flee Ohio rather than face death or great bodily harm upon the revocation of his parole without due process. Had Ohio's agents obeyed their own laws, Reed would not have been forced to flee.

88 Nearly twenty years before Reed was denied a parole revocation hearing, the United States Supreme Court in *Morrissey v. Brewer* set forth minimal due process requirements for parole revocation. *See* 408 U.S. at 484–89, 92 S.Ct. at 2601–04. These standards were soon thereafter adopted by Ohio courts, in *Parker v. Cardwell*. *See* 289 N.E.2d at 385; *see also* Ohio Admin.Code § 5120:1–1–18 (1979, prior to 1995 amendment) (specifying procedures for on-site parole revocation hearing). Under *Morrissey*, the Due Process Clause requires that a parolee receive a preliminary hearing in order to determine whether there is probable cause for revocation. Upon a finding of probable cause, there must still be a second final hearing. *Morrissey*, 408 U.S. at 485–89, 92 S.Ct. at 2602–04; *Parker*, 289 N.E.2d at 385.

89 The preliminary hearing—or on-site hearing as it is sometimes called—should be "conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available." Moreover, the hearing should be supervised by a hearing officer who is "not directly involved in the case." *Morrissey,* 408 U.S. at 485, 92 S.Ct. at 2602; *see also Parker,* 289 N.E.2d at 385. At the hearing the parolee must be given the opportunity to speak and present evidence in his or her own behalf, and should be able to question those who have provided the adverse information upon which the parole revocation is based. Before determining whether there is probable cause for revocation, the hearing officer must examine the information presented at the hearing. *Morrissey,* 408 U.S. at 486–87, 92 S.Ct. at 2602–03; *Parker,* 289 N.E.2d at 385; *see also State v. Mingua,* 42 Ohio App.2d 35, 327 N.E.2d 791, 794–95 (1974). Only after a finding of probable cause at the on-site hearing can the parolee be returned "to the state correctional institution pending the final decision." *Morrissey,* 408 U.S. at 487, 92 S.Ct. at 2603. The undisputed record shows that the agents of Ohio's penal system intended to deny to Reed this basic due process guarantee.

90 Though we do not base our determination on the illegality of Ohio's conduct, it is apparent that the attempt by agents of the Ohio Parole Authority to revoke Reed's parole without a preliminary on-site hearing was unconstitutional. Under the uncontradicted evidence, no other conclusion is possible. *See id.* at 484, 92 S.Ct. at 2602 ("[T]here is no interest on the part of the State in revoking parole without any procedural guarantees at all."); *State v. Vigil,* 97 N.M. 749, 750–51, 643 P.2d 618, 619–20 (Ct.App.1982) (discussing *Morrissey* and reversing probation revocation because defendant was denied right of confrontation at revocation hearing). Though our conclusion here is not affected by Ohio law, it is almost certain that this conduct would be found to violate Ohio's own Constitution and its laws governing the revocation of parole. *See* Ohio Const. art. I, § 1 (Banks–Baldwin 1994) (right to defend liberty); Ohio Const. art. I, § 16 (Banks–Baldwin

1994) ("due course of law"); *see also Parker,* 289 N.E.2d at 385 (adopting the procedures set forth in *Morrissey* ); *State v. Hochhausler,* 76 Ohio St.3d 455, 668 N.E.2d 457, 463 (1996) (discussing due process under Ohio Constitution); Ohio Amin.Code § 5120:1–1–18 (procedures for parole revocation).

91 This conclusion is not binding on any subsequent adjudication, any more than a finding of liability in a civil trial for a particular cause of action is binding on a determination of guilt in a criminal trial for the same cause of action. *See State v. Hoeffel,* 112 N.M. 358, 359–60, 815 P.2d 654, 655–56 (Ct. App.1991) (civil verdict is not binding on related criminal proceeding). However, under *Doran,* it is our duty as the asylum state to determine whether Reed is a fugitive. *See* 439 U.S. at 289, 99 S.Ct. at 535. We are limited to the evidence in the record in making this determination. The evidence of Ohio's conduct bears directly on the question we must answer: whether Reed was a fugitive from justice.

92 From our standpoint, it is immaterial whether the actions of the State of Ohio are ultimately vindicated or condemned. Because of those actions—whatever their legal posture—the district court was faced with the choices of invoking a virtually sui generis remedy to the rigid precepts of extradition law or of returning Reed to possible death or great bodily harm. Reed has demonstrated beyond a reasonable doubt that, if not for the actions of the State of Ohio, New Mexico courts would not be faced with this choice. *Cf. Morrison v. Stepanski,* 839 F.Supp. 1130, 1142 (M.D.Pa.1993) (if not for deprivation of due process, things would be different).

93 Furthermore, because Ohio's conduct has placed this problem under our jurisdiction, we will seek resolution in our own laws and Constitution. While *Doran* forms the framework of our analysis, New Mexico is the state to which Ohio forced Reed to flee. In applying the *Doran* framework, we do not believe we are required by Ohio's actions to cast aside the jurisprudence that is unique to this state. The New Mexico Constitution guarantees rights that no law can abrogate. In addition to our own Bill of Rights, the

New Mexico Constitution offers unique protections that are not duplicated by its federal counterpart. We do not construe any provision of the federal constitution to require a New Mexico court to ignore its own constitutional guarantees of life and liberty and safety.

94 With these factors in mind, we will explain why Reed, in seeking refuge from injustice, is not a fugitive from justice.

## C. Duress

### 1. Duress defined

95 Among the oldest principles of criminal law is that "it is not reasonable to punish conduct, however criminal it may be, if that conduct was not the product of the actor's own, unimpeded will." 2 Gene P. Schultz, *Proving Criminal Defenses* ¶ 9.01 (1994); *see* 4 Blackstone, *supra*, at *27. ("[A] man should be excused for those acts which are done through unavoidable force and compulsion."). Duress and necessity are two forms of compulsion that may be raised as valid defenses in criminal law. Though we will refer to the defense raised by Reed as "duress," some of his claims might be categorized as necessity. This is immaterial because the distinction between duress and necessity has been blurred by modern case law and is no longer deemed decisive. *See United States v. Bailey*, 444 U.S. 394, 410, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980). Both these "defenses were designed to spare a person from punishment if he acted 'under threats or conditions that a person of ordinary firmness would have been unable to resist,' or if he reasonably believed that criminal action 'was necessary to avoid a harm more serious than that sought to be prevented by the statute defining the offense.'" *Id.* at 410, 100 S.Ct. at 634 (quoting—and reversing on other grounds—*United States v. Bailey*, 585 F.2d 1087, 1097–98 (D.C.Cir.1978)). The courts of Ohio recognize the defense of duress. *See State v. Procter*, 51 Ohio App.2d 151, 367 N.E.2d 908, 913 (1977) (stating that Ohio recognizes that the defense of duress "as a legitimate defense to all crimes, except the taking of the life of an innocent person"). Similarly, we have held "that duress is a defense available in New Mexico except when the crime charged is a homicide or a crime requiring intent to kill." *Esquibel v. State*, 91 N.M. 498, 501, 576 P.2d 1129, 1132 (1978), *overruled on other grounds by State v. Wilson*, 1994 NMSC 008, 116 N.M. 793, 795–96, 867 P.2d 1175, 177–78.

96 Many extradition cases establish rules that tend to limit duress as a defense to the *Doran* fugitivity requirement. We find that none of these cases apply to the distinctive facts of Reed's case. For example, many courts have noted that the motives of the demanding state are beyond review. It is irrelevant that the defendant could show that, notwithstanding the express language of the extradition documents, the demanding state's unspoken motives are vindictive, illegal, or dishonest. *See Golden v. Dupnik*, 151 Ariz. 227, 726 P.2d 1096, 1099 (App.1986); *Beckwith v. Evatt*, 819 S.W.2d 453, 457–58 (Tenn.Crim.App.1991) ("[T]he petitioner is not entitled to probe more deeply into any political motivation inspiring the issuance of the governor's warrant."). However, we do not grant habeas corpus because Ohio seeks Reed's return solely for the purpose of suppressing his speech activities. We do not consider Ohio's motives but rather the effect of Ohio's *conduct*. Whatever its motives, had Ohio conducted itself appropriately, Reed would not have been forced to choose between death and flight. More importantly, our courts would not have been forced to choose between ignoring and preventing the violation of Reed's constitutional rights.

97 The courts of the asylum state may not prognosticate about the fairness or anticipated result of judicial proceedings in the demanding state. *Drew v. Thaw*, 235 U.S. 432, 440, 35 S.Ct. 137, 138, 59 L.Ed. 302 (1914); *Strachan*, 568 N.Y.S.2d 895, 571 N.E.2d at 68. Thus, if Reed were finally given a preliminary on-site hearing upon being returned to Ohio, we have no jurisdiction to speculate on the impartiality or possible outcome of that hearing. We do not address this question at all. Our concern is that Reed would never have fled Ohio had he been promised a hearing in the first place. For this reason he was never at any time a fugitive from justice. Whether Reed could

now receive a hearing in Ohio is irrelevant. The belated offer of a hearing cannot somehow transform him into a fugitive.

98 The Uniform Criminal Extradition Act states that the asylum state's courts may not question the guilt or innocence of the defendant for any crimes charged in the demanding state. Section 31-4-20. We do not consider whether Reed was legitimately found guilty of the complaint made by Steve Devoto, whether under Ohio law he could be found guilty of violating parole, or whether his original convictions for aggravated robbery and theft of drugs were valid. Under the *Doran* analysis, the question of criminal charges is considered separately from the fugitive question. A person may not be a fugitive even though legitimately charged with a crime in the demanding state. We consider only whether, regardless of the various charges, Reed may be considered a fugitive from justice. His guilt or innocence for these crimes is irrelevant to the novel circumstances that caused him to flee Ohio under duress.

99 The courts of the asylum state have no authority to investigate prison conditions in the demanding state. *Pacileo v. Walker,* 449 U.S. 86, 87–88, 101 S.Ct. 308, 308–09, 66 L.Ed.2d 304 (1980); *Sweeney v. Woodall,* 344 U.S. 86, 87–89, 73 S.Ct. 139, 139–40, 97 L.Ed. 114 (1952). This is true even when federal courts have previously concluded that the prison system of the demanding state violates proscriptions against "cruel and unusual punishment." *Brown v. Sheriff of Wayne County,* 415 Mich. 658, 330 N.W.2d 335, 343–44 (1982). Reed is not alleging that his extradition should be barred because the overall prison conditions in Ohio are inhumane; rather he is arguing—and the district court agreed—that he was singled out for imprisonment so that he could be beaten or killed by government officials. Though, in his writings, Reed alleged many grievances against the Ohio penal system, those grievances are not the basis of his defense. The general prison conditions and the treatment of other prisoners have no bearing on the kind of individual treatment he reasonably feared he would receive in the hands of state officials. Reed fled the apparently conspiratorial intent of state officials to subject a him to death or great bodily harm. We have found no case, including *Sweeney v. Woodall,* that contemplates such a situation. *See* 344 U.S. at 91–92, 73 S.Ct. at 141–42 (Douglas, J., dissenting) (describing horrific prison conditions suffered by Woodall, but in no way suggesting that his suffering was unique within the prison, or that he was singled out by government officials).

100 Also beyond the scope of review is the defendant's fear of being confined with other inmates who have threatened him or who may have reason to injure him. Thus, a defendant cannot avoid extradition because he will be incarcerated in the same prison as a co-defendant against whom he testified. *Chamberlain v. Celeste,* 729 F.2d 1071, 1077 (6th Cir.1984). Reed's case is distinguished because it is the prison officials themselves—his putative protectors—who threatened him harm.

## 2. Fundamental constitutional rights

101 Reed has shown beyond a reasonable doubt, with persuasive and uncontroverted evidence, that he left Ohio because he risked death or great bodily harm at the hands of prison officials if he had reported to be arrested by his parole officer. Reed was not threatened with the deprivation of any ordinary civil right—not merely liberty or freedom of speech—but with the deprivation of life itself. There is no right more fundamental than the right to one's own life.

102 The New Mexico Constitution decrees that the government may deprive no person of life "without due process of law." NM Const. art. II, § 18 (as amended 1972). Moreover, the New Mexico Constitution guarantees that the enjoyment of "life and liberty" is a "natural, inherent and inalienable" right. NM Const. art. II, § 4. The same provision of our Constitution also accords the same value to the right "of seeking and obtaining safety and happiness." *Id.* The Ohio Constitution contains similar provisions. *See* Ohio Const. art. I, § 1 ("All men ... have certain inalienable rights, among which are those of enjoying and defending life and liberty ... and seeking and obtain-

**150**

ing happiness and safety."); Ohio Const. art. I, § 16 (due course of law).

■ 103 When a person's life is jeopardized by the actions of the state without due process, no constitutional interest is of greater consequence. *See Tennessee v. Garner,* 471 U.S. 1, 9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985) ("The suspect's fundamental interest in his own life need not be elaborated upon."). The transgression is not only against a single human being but also the most basic principles upon which our system of government was founded.

> From the popular hatred and abhorrence of illegal confinement, torture and extortion of confessions of violations of the 'law of the land' evolved the fundamental idea that no man's life, liberty or property be forfeited as criminal punishment for violation of that law until there had been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement and tyrannical power. Thus, as assurance against ancient evils, our country, in order to preserve 'the blessings of liberty', wrote into its basic law the requirement, among others, that the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed.

*Chambers v. Florida,* 309 U.S. 227, 236–37, 60 S.Ct. 472, 477, 84 L.Ed. 716 (1940). There can be no dispute that the gravest constitutional concerns are raised by a showing that, upon revocation of parole, a defendant will be subject to death or great bodily harm at the hands of state officials. When a case presents extraordinary circumstances, the presumptions in favor of extradition may be defeated. *See, e.g., Bowman,* 264 N.E.2d at 153 ("The ends of justice will not be served by enforcing extradition for the crime involved on a person who has lived openly within this State for the last eighteen years, and who has been imprisoned on three occasions during the pendency of the extradition proceedings."). *But see People v. Martin,* 208 Ill.App.3d 857, 153 Ill.Dec. 870, 567 N.E.2d 1097, 1100 (1991) (disputing *Bowman* ). This case presents extraordinary circumstances. When extradition will directly

result in the deprivation without due process of the defendant's life, the New Mexico Constitution requires the protection of his or her life and safety. NM Const. art. II, §§ 4 & 18.

104 The *Doran* court relied upon the early case, *In re Strauss,* which acknowledged that the extradition process may be tainted by official corruption. However *Strauss* went on to say that extradition "is but one step in securing the presence of the defendant in the court in which he may be tried, and in no manner determines the question of guilt." *In re Strauss,* 197 U.S. 324, 332–33, 25 S.Ct. 535, 537, 49 L.Ed. 774 (1905) (quoted by *Doran,* 439 U.S. at 288, 99 S.Ct. at 535). Nevertheless, we have been presented with circumstances in which extradition is something much more invidious than a mere "step in securing the presence of the defendant." *Id.* Extradition, in this particular case, initiated a process intended to place the defendant in the hands of those who threatened to violate his most basic constitutional rights. When confronted with such an exceptional situation, we do not believe we are required to discard the protections guaranteed by our own constitution.

105 We hold that the extradition process was not meant to abrogate the New Mexico Constitution which regards "seeking and obtaining safety" as a "natural, inherent and inalienable" right. *See* NM Const. art. II, § 4. Reed came to New Mexico explicitly for the purpose of "seeking and obtaining safety." Our courts have not fully defined the scope of this constitutional provision. *See State v. Sutton,* 112 N.M. 449, 455, 816 P.2d 518, 524 (Ct.App.1991), *modified on other grounds, State v. Gomez,* 1997 NMSC 006, ¶ 32, 122 N.M. 777, 786, 932 P.2d 1, 10. However, it certainly applies to individuals like Reed who were threatened with death or great bodily harm by government officials of another state, and who had no recourse or remedy within that threatening state. "In interpreting the more expansive language of Article II, Section 4, we are mindful of the more intimate relationship existing between a state government and its people, as well as the more expansive role states traditionally have played in keeping and maintaining the

peace within their borders." *California First Bank v. State*, 111 N.M. 64, 76, 801 P.2d 646, 658 (1990). On a national level, when the broad concept of federalism is concerned, the rights of the individual are sometimes displaced. However, on the state level, our Constitution can offer not only to protect life, but also the "more expansive" guarantee of obtaining safety. One of the more important functions of the individual states is to secure the rights of the individuals within their borders. *See id.; Gomez*, 1997 NMSC 006, ¶¶ 18–20, 122 N.M. at 783–84, 932 P.2d at 7–8 (stating that New Mexico follows an interstitial rather than lock-step approach to constitutional interpretation, discussing circumstances in which our own constitution is interpreted differently from its federal counterpart).

### 3. Factors that make this case unique in extradition law

106 Throughout this opinion we have emphasized that, in the context of extradition law, Reed's situation is unique. There is no controlling authority that addresses all of the peculiar circumstances of this case. We have closely studied and sought guidance from the many judicial opinions and accepted canons of extradition law. Nevertheless, a mechanical reading of this precedent would overlook important elements of Reed's case and militate the intolerable result of sending him back to face death or great bodily harm. Whatever a court's mandate may be under extradition law, it is clearly not to send a defendant back to face such a fate.

107 Several factors bring this case outside the ordinary tenets of extradition law. In defining these factors we have looked to New Mexico jury instructions and judicial opinions that set forth the elements necessary for a successful duress defense. *See* UJI 14–5130 NMRA 1997 (stating duress requires that defendant feared immediate great bodily harm if he or she did not commit the crime and if a reasonable person would have acted in the same way); *Esquibel*, 91 N.M. at 500, 576 P.2d at 1131 (same elements); *see also Procter*, 367 N.E.2d at 913 (duress requires well-grounded apprehension of present and imminent death or serious

bodily injury). The amicus suggests that Reed's status as a parole violator-at-large is analogous to that of an escaped convict; thus insight may be found in the jury instructions that set forth the elements of duress as a defense to escaping from a jail or penitentiary. *See* UJI 14–5132 NMRA 1997. Also, within extradition case law, there are frequently mentioned circumstances—such as the lack of a remedy in the demanding state—that, if proven, would strengthen a claim of duress. *See, e.g., Sweeney*, 344 U.S. at 89, 73 S.Ct. at 140 (noting that fugitive made no showing that relief was unavailable in the courts of the demanding state). These various sources describe some of the considerations that are relevant in establishing a duress defense in an extradition context. No single factor or group of factors is dispositive. In the present case, the following circumstances demonstrate why the trial court's determination is supported by substantial evidence.

### a. Reed was properly and legally released from imprisonment

108 The record shows that Reed began his one-year parole term on May 5, 1992. No legal actions were taken to revoke his parole up to March 22, 1993, the likely date he fled from Ohio. Nor was he arrested because of Steve Devoto's complaint or for any other reason. Thus, up to the moment he fled, his release from prison was entirely legal. He was not, for example, an escaped convict, nor was there any warrant for his arrest. In this regard, the only question before us is the legality of the flight itself. *See United States v. Corona*, 687 F.Supp. 84, 86 n. 2 (S.D.N.Y.) ("While flight is generally considered one of the means of reasonably avoiding coerced criminal activity, in the present case the flight itself was alleged the crime."), *aff'd mem.*, 868 F.2d 1268 (2d Cir. 1988).

### b. Reed reasonably feared death or great bodily harm from state officials

109 Reed has proven beyond a reasonable doubt that prison officials expressed an intention to cause him death or great bodily

harm if he were ever returned to Lucasville. Moreover, we accept his conclusion that his parole was about to be revoked without a due process hearing. His parole officer told him to "say your goodbyes to your family and friends," and assured Reed he would have no preliminary on-site hearing before revocation. Reed knew the workings of the parole revocation process. He was sufficiently knowledgeable to understand that the parole officer's words signified he was being denied his due process rights. He reasonably feared that his parole was going to be revoked and that he would be returned to Lucasville where prison officials could carry out their threats to kill him or cause him bodily harm.

110 We do not believe that in this situation it is logical to require that the death or great bodily harm be "impending," "immediate," "present," or "imminent." In this case, such terminology would be misleading. "What constitutes present, immediate and impending compulsion depends on the circumstances of each case." *Esquibel,* 91 N.M. at 502, 576 P.2d at 1133. A more precise resolution of this immediacy condition is provided by another of the factors discussed below which requires proof that the accused had no relief in the demanding state. *See id.* at 499–500, 576 P.2d at 1130–31 (stating "opportunity to avoid" is alternative expression to "present, imminent, and impending"). The showing of harm in this case is similar to the showing of a "well-founded fear of persecution" found in cases of asylum from foreign nations. *See Immigration & Naturalization Serv. v. Cardoza–Fonseca,* 480 U.S. 421, 423, 107 S.Ct. 1207, 1208, 94 L.Ed.2d 434 (1987) (quoting 8 U.S.C. § 1101(a)(42) (1982)). Additionally, it would be impossible for a defendant to predict the future and prove absolutely that he or she would be killed or beaten upon return to prison. *United States v. Dagnachew,* 808 F.Supp. 1517, 1522 (D.Colo.1992) (no need to absolutely prove harm). The constitutional rights at stake are so important that we believe it is sufficient to show, as Reed has, that the fear was reasonable.

## c. Reed used no force or violence during or after flight from the demanding state

111 There is no contention that Reed committed any act of force or violence in prison, on parole, or after his flight from Ohio. The undisputed record proves that Steve Devoto's "terroristic threatening" complaint involved no actual force or violence.

## d. There was no relief or protection in the demanding state

112 The circumstances of a parolee who leaves his or her home state under duress are analogous to those of a convict who escapes prison under duress. In determining whether Reed had an adequate remedy in Ohio, it is useful to look at the comparable requirement that escaped prisoners must prove. The escapee must show, either that there was no time to complain to or seek reprieve from governmental authorities, or that, under the circumstances, it would have been futile for him or her to complain to or seek reprieve from governmental authorities. *See* UJI 14–5132; *United States v. Kinslow,* 860 F.2d 963, 966 (9th Cir.1988) (discussing "opportunities to avoid the perceived danger"), *overruled on other grounds by United States v. Brackeen,* 969 F.2d 827, 829 (9th Cir.1992).

113 It is apparent from the record that the Parole Authority was intractable in its resolve to return Reed to Lucasville as quickly as possible. Direct appeals to the Parole Authority and other Ohio officials proved futile. It would surely have forestalled Reed's flight from Ohio if he could have filed a petition in state or federal court seeking equitable relief enjoining the Parole Authority from revoking his parole without an on-site preliminary hearing.

114 However, Reed learned of Steve Devoto's complaint on a Thursday evening. He called his parole officer the next day, Friday morning. He was instructed to report to be arrested at 9:00 a.m. the following Monday morning. Friday, after his phone call to the parole officer, was Reed's only opportunity to fully appreciate his options, find legal representation, compose the proper documents, gather any necessary fees, file a petition, and

receive a judicial remedy before the courts closed Friday evening. Reed cannot be held liable for his inability to initiate a legal action within the last few business hours before his arrest. Moreover, it is not certain what judicial remedy he could seek before actually being arrested. *Cf. Younger v. Harris,* 401 U.S. 37, 43, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971) (discussing limited circumstances in which court in equity can interfere with a criminal prosecution). Under the undisputed facts, Reed "did not have time to complain to or seek reprieve from governmental authorities." *See United States v. Agard,* 605 F.2d 665, 667 (2d Cir.1979) (discussing the lack of a "reasonable opportunity to escape other than by engaging in the otherwise unlawful activity").

115 The futility of seeking reprieve from Ohio governmental officials was underscored by the inflexibility of Reed's parole officer, the history of seemingly conspiratorial animosity from officials at the Ohio Department of Corrections and the Parole Authority, and the frantic ineffectual phone calls initiated on Reed's behalf by Pepinsky. To borrow the words of the U.S. Supreme Court, "if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,'" the defense of duress will fail. *United States v. Bailey,* 444 U.S. at 410, 100 S.Ct. at 634 (quoting Wayne R. LaFave & Austin W. Scott, *Handbook on Criminal Law* 379 (1972)). Reed did not have such an alternative.

### e. Reed's allegedly unlawful behavior was provoked by the demanding state

116 Most significant in this case is that the State of Ohio provoked the very parole violation upon which it now bases its demand for extradition. Reed's predicament was caused by state officials acting under color of state law. He had no reasonable recourse other than flight. Normally we trust the state to control those who threaten to deprive a person of life without due process. But when the state itself is the one posing the threat—and when, as in this case, federal remedies have been refused—the only one who can protect the individual from the threat is a sister state.

117 The uncontroverted evidence is that the original extradition petition is the direct result of a concerted effort by the agents of Ohio to deny Reed of his most basic rights without due process. Furthermore, Reed steadfastly asserts he would never have left Ohio if he had been promised a due process hearing. Using these facts to illuminate the legitimacy of the extradition demand, we are immediately faced with the question of whether a state by clearly inappropriate, if not unconstitutional, misconduct can create a fugitive from justice where otherwise none would exist.

118 The law is replete with examples in which a state is prohibited from taking advantage of its affirmative acts that deny due process to a defendant. *See, e.g., State v. Breit,* 1996 NMSC 067, ¶¶ 18–48, 122 N.M. 655, 666–70, 930 P.2d 792, 803–07 (prosecutorial misconduct); *State v. Smith,* 14 Ohio St.3d 13, 470 N.E.2d 883, 885–86 (1984) (same); *State v. Gutierrez,* 1993 NMSC 062, 116 N.M. 431, 445–47, 863 P.2d 1052, 1066–68 (unreasonable search and seizure); *State v. Pi Kappa Alpha Fraternity,* 23 Ohio St.3d 141, 491 N.E.2d 1129, 1131–33 (1986) (same). We see no reason why extradition should be exempt from this constitutional principle. "If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled on other grounds by Berger v. New York,* 388 U.S. 41, 50–54, 87 S.Ct. 1873, 1879–81, 18 L.Ed.2d 1040 (1967); *see also Galloway,* 507 So.2d at 594–95 ("[T]he constitution forbids a state from exercising its extradition powers based on false accusations, simple ignorance of the law or wanton abuse of process.").

119 The fact that a state is prohibited from taking advantage of its own unlawful conduct brings this case outside the traditional holding that "[a]n individual brought into the asylum state involuntarily, unlawfully, or under compulsion is still a fugitive from justice." *Dunn v. Hindman,* 836 F.Supp. 750, 755–56 (D.Kan.1993); *see, e.g., Mozingo*

*v. State*, 562 So.2d 300, 303–05 (Ala.Crim. App.1990) (prisoner arrested for crime in demanding state, transferred legally to prison in another state, is fugitive upon parole from prison); *Ex parte Ponzi*, 106 Tex.Crim. 58, 290 S.W. 170, 173 (1926) (defendant allegedly kidnapped in one state and brought into asylum state). We hold that, in extradition cases, duress may be raised as a defense to the fugitivity element if the individual was incited to cross state lines—and would otherwise never have done so—by the illegal actions of the demanding state. A state cannot now exploit its own unlawful conduct.

120 It has been suggested that Ohio had no constitutional obligation to provide Reed a preliminary hearing prior to taking him into custody. This suggestion seriously misconstrues Reed's circumstances. This implies that Reed should have allowed himself to be arrested so as to test the reliability of his parole officer's threat that he would be returned to Lucasville without a hearing. The question in this case is not whether Reed should receive a hearing after being taken into custody. Rather, it is whether Reed was promised a hearing before he was taken into custody. The fact is, he was promised he would *not* receive a hearing upon being arrested. Moreover, he reasonably believed, upon being returned to Lucasville without a hearing, he would be subject to death or great bodily harm. It is not reasonable to require a defendant to stake his life on the likelihood that the state will follow the dictates of due process after it has threatened not to do so.

121 Similarly, we distinguish this case from those that dismiss, in an extradition proceeding, consideration of the defendant's motives or reasons for leaving the demanding state. *See Appleyard v. Massachusetts*, 203 U.S. 222, 227, 27 S.Ct. 122, 123, 51 L.Ed. 161 (1906). It has even been held that a defendant's "fear for his personal safety was not sufficient to justify his flight from justice." *Dunn*, 836 F.Supp. at 756. Thus, there are several disturbing cases in which there was no defense for those who feared being lynched. *See, e.g., People ex rel. Heard v. Babb*, 412 Ill. 507, 107 N.E.2d 740, 742 (1952) ("His fear of lynching does not change the

nature of the act, but merely constitutes the motive therefor."). This case is of an entirely different order because the demanding state itself threatened the defendant's safety, and then attempted to extradite him for a violation that never would have occurred had the demanding state followed its own laws. Our holding is in accord with those few cases that granted writs of habeas corpus to defendants who proved they would find no governmental protection from being lynched upon extradition to the demanding state. *See, e.g., Commonwealth ex rel. Mattox v. Superintendent of County Prison*, 152 Pa.Super. 167, 31 A.2d 576, 577 (1943) (refusal to extradite upon showing of competent evidence that officials in the demanding state would not protect defendant from lynching); *In re Hampton*, 2 Ohio Dec. 579, 579 (Hamilton County C.P.1895) (judge, who previously extradited prisoner into the hands of a lynch mob in Kentucky, refused to extradite another prisoner to Kentucky).

122 Additionally, it makes no difference that Reed might be provided a hearing in Ohio in which he could answer for fleeing the state. Ohio's delayed offer of due process has no bearing on Reed's status as a fugitive in the State of New Mexico. *Doran* requires that we determine whether Reed is a fugitive and it violates basic justice to presume under the undisputed facts that Reed was ever at any time a fugitive. The State of Ohio cannot now use the offer of a belated hearing to transform Reed into a fugitive from justice. *Cf. Hurtado v. California*, 110 U.S. 516, 536, 4 S.Ct. 111, 121, 28 L.Ed. 232 (1884) ("Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude."). Conduct that was valid in the eyes of the law at the time it occurred, cannot after the fact—ex post facto—be rendered invalid. *See State v. Alderette*, 111 N.M. 297, 300, 804 P.2d 1116, 1119 (Ct.App.1990). Administrative bodies—like the Parole Authority—"cannot change innocence into guilt; or punish innocence as a crime," any more than can legislative bodies. *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388, 1 L.Ed. 648 (1798) (discussing ex post facto laws passed by legislative bodies).

In raising these issues, we are not, despite the concerns of the State, deciding whether Ohio can now rightfully pursue a hearing process that it originally seems to have waived. Nor will we consider the "unclean hands" with which Ohio offers a belated parole revocation hearing. *Olmstead*, 277 U.S. at 483–84, 48 S.Ct. at 574–75 (Brandeis, J. dissenting) ("[A] court will not redress a wrong when he who invokes its aid has unclean hands.... Where the government is the actor, the reasons for applying [the doctrine of unclean hands] are even more persuasive."). Nor, as the amicus posits, do we explore a "presumption of vindictiveness" on the part of Ohio. *Dunn*, 836 F.Supp. at 754. Rather, the question before us is whether, in light of Ohio's actions—however legal and constitutional they may or may not be—Reed should be considered a fugitive. We conclude that no offer of a hearing could turn Reed into a fugitive once it was established he was never a fugitive in the first place.

### f. Reed's circumstances invoke protections in the New Mexico Constitution

124 The New Mexico Constitution requires that we grant Reed's writ of habeas corpus. Reed faced the deprivation of his life without due process of law if he had remained in Ohio. The New Mexico Constitution cannot tolerate such an outcome. NM Const. art. II, §§ 4 & 18. Moreover, Reed was precluded from seeking safety in Ohio. The deprivation of his life would have been carried out under color of state law and Reed was denied any legal recourse against this deprivation. He fled to New Mexico for the express purpose of finding safety. For this reason, Reed properly comes under the protection of Article II, Section 4 of the New Mexico Constitution which guarantees the right "of seeking and obtaining safety." Reed did not flee from justice. He sought refuge from injustice.

### g. A reasonable person under similar circumstances would have acted as did Reed

125 The State presented no evidence to undermine Reed's contention that he was faced with a choice of evils: either being killed at Lucasville or flight from Ohio. *See United States v. Bailey*, 444 U.S. at 410, 100 S.Ct. at 634 (defining the defense of necessity as "choice of evils" in which "physical forces beyond the actor's control rendered illegal conduct the lesser of two evils"). A reasonable person in Reed's situation would choose escape above the probability of death or bodily injury.

### VIII. CONCLUSION

126 Extradition laws are intended to bring offenders to justice. They are not intended to be—and we cannot suffer them to be—a vehicle for the suppression of constitutional rights. Courts in this nation have always been empowered to prevent injustice. *See Hampton*, 2 Ohio Dec. at 579 (refusing to extradite defendant who was in proven danger of being lynched). Habeas extradition proceedings are not exempted from the exercise of this power. For the foregoing reasons we conclude that, under the uncontroverted facts of this case, Reed is not a fugitive from justice. We affirm the district court in granting his writ of habeas corpus.

127 IT IS SO ORDERED.

SERNA and McKINNON, concur.

BACA, Justice (dissenting)

MINZNER, Justice, (specially concurring).

MINZNER, Justice (specially concurring).

128. While I concur in the result reached by the majority, I respectfully disagree with the fugitivity analysis relied upon by the majority. The circumstances of this case require us to consider the respective roles of the courts of this State and those of Ohio, but I believe the analysis on which the majority opinion relies expands the role of an asylum state beyond acceptable limits. Both the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, and the Supreme Law of the Land Clause of the New Mexico Constitution, NM Const. art. II, § 1, compel us to recognize limits on the power and authority of an asylum state. The analysis on which the majority opinion relies would take this Court, and other courts, be-

yond those limits. Nevertheless, I agree with the majority that, on these facts, the district court's decision should be affirmed. Ohio has not demonstrated the requisite probable cause necessary for justifying the restraint of Reed's conditional liberty as a parolee involved in extradition. As a result, I would affirm the grant of the writ of habeas corpus for Ohio's failure to substantially charge Reed with a parole violation.

## I.

129. As the majority opinion explains, the U.S. Constitution explicitly mandates the extradition of a fugitive upon the "Demand of the executive Authority of the State from which he fled...." U.S. Const. Art. IV, § 2. The United States Supreme Court has specifically limited the scope of inquiry available to courts in an asylum state in the context of a request for extradition. *California v. Superior Court*, 482 U.S. 400, 402, 107 S.Ct. 2433, 2435, 96 L.Ed.2d 332 (1987) ("At issue in this case are the *limits imposed by federal law upon state court habeas corpus proceedings* challenging an extradition warrant.") (emphasis added). "The courts of asylum States may do no more than ascertain whether the requisites of the Extradition Act have been met." *California*, 482 U.S. at 408, 107 S.Ct. at 2438; *see also Michigan v. Doran*, 439 U.S. 282, 289, 99 S.Ct. 530, 535, 58 L.Ed.2d 521 (1978) (limiting judicial inquiry in habeas corpus proceedings challenging extradition to four issues: technical compliance with required documentation; existence of a crime charged against defendant; concurrence of identity between the defendant and the person sought for extradition; and fugitivity).

130. In *Michigan v. Doran*, the Supreme Court limited the scope of habeas review in order to protect the principle, embodied in the Extradition Clause, of preventing "any state from becoming a sanctuary for fugitives from justice of another state and thus 'balkanize' the administration of criminal justice among the several states." *Doran*, 439 U.S. at 287, 99 S.Ct. at 534. Indeed, frustration of these principles "would create a serious impediment to national unity," *Puerto Rico v. Branstad*, 483 U.S. 219, 227, 107 S.Ct. 2802,

2807, 97 L.Ed.2d 187 (1987) (finding in the federal courts a power to compel extradition), because federal limits to state authority in extradition matters "are an essential part of the Framers' conception of national identity and union." *California*, 482 U.S. at 405, 107 S.Ct. at 2437.

131. The majority opinion relies heavily on the issue of "fugitivity," a permissible ground of review under *Doran*. However, the issue of fugitivity is a narrow one. "[T]o be a fugitive from justice it is necessary 'that having within a state committed that which by its laws constitutes a crime, when he is sought to be subjected to its criminal process to answer for his offence [sic], he has left its jurisdiction and is found within the territory of another.'" *California*, 482 U.S. at 419, 107 S.Ct. at 2444 (Stevens, J., dissenting) (quoting *Roberts v. Reilly*, 116 U.S. 80, 97, 6 S.Ct. 291, 300, 29 L.Ed. 544 (1885)). Thus, justice, in the phrase "fugitive from justice," does not mean the "administration of what is just" or fair; it means the administration of law. Webster's Third New International Dictionary 1228 (1976) (defining "justice" separately as "the maintenance and administration of what is just" and the "administration of law"). *But see* Majority Opinion, ¶ 86. As long as the accused "committed that which by [the demanding state's] laws constitutes a crime," the justice portion of fugitivity is satisfied. This term does not allow an asylum state to question the fairness with which the demanding state treated the accused.

132. As a result, the U.S. Supreme Court has found it sufficient that the accused meet "the technical definition of a 'fugitive.'" *California*, 482 U.S. at 408, 107 S.Ct. at 2438. The only issue under fugitivity other than presence in the asylum state is flight from the demanding state. Under the requirement of flight, "when [the accused] is sought to be subjected to [the demanding state's] criminal process.... he has left its jurisdiction." *Roberts*, 116 U.S. at 97, 6 S.Ct. at 300. This requirement is responsible for the factual inquiry in habeas cases. *See, e.g., Galloway v. Josey*, 507 So.2d 590, 593 (Fla.1987). In effect, presence in the demanding state at the time of the commission of a crime is a

jurisdictional requirement without which principles of comity would not command extradition. Thus, any inquiry into the motives of the accused in fleeing the demanding state, or the conduct of the demanding state in relation to the accused, under the fugitivity requirement transgresses the spirit, if not the letter, of a long line of U.S. Supreme Court opinions.

133. In *Sweeney v. Woodall*, 344 U.S. 86, 87–88, 73 S.Ct. 139, 139–40, 97 L.Ed. 114 (1952) (per curiam), the Supreme Court reversed a Federal Court of Appeals' remand of a habeas corpus petition on allegations of confinement of the accused amounting to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The Supreme Court found that "[c]onsiderations fundamental to our federal system require that the prisoner test the claimed unconstitutionality of his treatment by [the demanding state] in the courts of that State." *Sweeney*, 344 U.S. at 90, 73 S.Ct. at 140 (emphasis added). The Court noted that the "resort to a form of 'self-help' " in fleeing the demanding state should neither weaken the demanding state's authority to review the accusations of official misconduct nor create authority in the asylum state to review the actions of those officials. *Sweeney*, 344 U.S. at 89–90, 73 S.Ct. at 140 ("Had he never eluded the custody of his former jailers he certainly would be entitled to no privilege permitting him to attack Alabama's penal process by an action brought outside the territorial confines of Alabama in a forum where there would be no one to appear and answer for that State.").

134. In *Pacileo v. Walker*, 449 U.S. 86, 101 S.Ct. 308, 66 L.Ed.2d 304 (1980), the Court applied the rationale of *Sweeney* to actions of state courts by reversing a writ of habeas corpus granted to an escaped felon by the California Supreme Court on the basis that a penitentiary in Arkansas, the demanding state, potentially operated in violation of the Eighth Amendment. Relying on *Doran* and *Sweeney*, the Supreme Court found that "claims as to constitutional defects in the Arkansas penal system should be heard in the courts of Arkansas, not those of California." *Pacileo*, 449 U.S. at 88, 101 S.Ct. at 309.

135. Finally, in *California v. Superior Court*, the Supreme Court reversed a writ of habeas corpus granted by the California Supreme Court based on a finding that a valid California custody decree precluded a valid charge of kidnapping against the legal custodian under the law of Louisiana, the demanding state. *California*, 482 U.S. at 404–05, 107 S.Ct. at 2436–37. The U.S. Supreme Court refused to allow inquiry by an asylum state into potential defenses despite the virtual impossibility of the crime and the substantial state interest of California in the enforcement of its child custody decree under the Full Faith and Credit Clause, a constitutional provision with purposes similar to the Extradition Clause. *California*, 482 U.S. at 412, 107 S.Ct. at 2440 ("[U]nder the Extradition Act, it is for the Louisiana courts to do justice in this case. . . .").

136. Throughout each of these cases, the U.S. Supreme Court has maintained that issues of the type involved here, such as alleged constitutional violations by officials of the demanding state, are to be addressed in the demanding state or, after exhaustion of remedies, in federal court. Duress is a substantive defense to a criminal act and touches on both the mens rea and the actus reus of the crime. *Cf. United States v. Micklus*, 581 F.2d 612, 615 (7th Cir.1978) (distinguishing necessity and duress on the basis of actus reus and mens rea). Under duress, there is no question that the accused committed the act in question; it is only culpability which is in dispute. Reed may raise the defense of duress in Ohio for the parole violation and also, if he were so charged under Ohio Rev. Code Ann. Section 2967.15(C)(1), for the offense of escape. *See State v. Cross*, 58 Ohio St.2d 482, 391 N.E.2d 319, 322–24 (1979) (discussing the defense of duress for the crime of escape); *see also Esquibel v. State*, 91 N.M. 498, 501–02, 576 P.2d 1129, 1132–33 (1978) (allowing the defense of duress for the crime of escape in the context of a history of beatings and serious threats by prison guards and personnel), *overruled on other grounds by State v. Wilson*, 1994 NMSC 008, 116 N.M. 793, 795–96, 867 P.2d 1175, 1177–

78. However, by creating an exception to extradition for governmentally-inflicted duress, the majority opinion appears to me inconsistent with existing case law. *Cf. California,* 482 U.S. at 407–08, 107 S.Ct. at 2438 (stating that extradition proceedings "are 'emphatically' not the appropriate time or place for entertaining defenses") (citations omitted).

137. A parolee is certainly entitled to a preliminary hearing to determine whether probable cause exists for believing the parolee has violated the conditions of parole. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). However, Ohio is not under a constitutional obligation to provide this hearing prior to taking the parolee into custody. *See Moody v. Daggett,* 429 U.S. 78, 87, 97 S.Ct. 274, 279, 50 L.Ed.2d 236 (1976) ("Loss of liberty as a parole violator does not occur until the parolee is taken into custody under the warrant."); *D'Amato v. U.S. Parole Com'n,* 837 F.2d 72, 75 (2d Cir.1988) (finding no due process violation when warrant for parole violation was issued but not yet executed). As a result, even if the parole officer in this case threatened to arrest Reed, the Adult Parole Authority (APA) then would have a reasonable time to afford Reed the preliminary hearing. *See Morrissey,* 408 U.S. at 485, 92 S.Ct. at 2602 ("[D]ue process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient *after arrest....*") (emphasis added). Even if Ohio were to deny Reed a preliminary hearing, it would be a decision of the APA, the proper neutral party to which *Morrissey* referred, and, eventually, the Ohio or federal judiciary, rather than the individual parole officer. Further, while it is true that in *Sweeney* there was no showing that relief was unavailable in the demanding state, Reed has not made a showing that relief actually is unavailable in Ohio. *Cf. Wright v. Ohio Adult Parole Authority,* 75 Ohio St.3d 82, 661 N.E.2d 728 (1996) (evaluating a petition for a writ of mandamus to compel reinstatement of parole), *cert. denied,* —— U.S. ——, 117 S.Ct. 127, 136 L.Ed.2d 77 (1996); *State ex rel. Jackson v. McFaul,* 73 Ohio St.3d 185, 652 N.E.2d 746, 748 (1995) ("[H]abeas corpus will lie in certain extraordinary circumstances where there is an unlawful restraint of a person's liberty....."); *Kellogg v. Shoemaker,* 46 F.3d 503, 510 (6th Cir.) (providing "prospective injunctive relief" under 42 U.S.C. § 1983 for violation of procedural due process rights by the Ohio Parole Revocation procedures), *cert. denied,* 516 U.S. 839, 116 S.Ct. 120, 133 L.Ed.2d 70, *cert. denied,* 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995).

138. I do not mean to suggest that conclusive proof of a constitutional violation by a demanding state would be sufficient to create authority in the asylum state to deny extradition. Rather, I believe the ambiguous showing by Reed of a constitutional violation and the unavailability of remedies in Ohio illustrates the troublesome nature of investigating Ohio's conduct without giving Ohio an opportunity to respond. *See Sweeney,* 344 U.S. at 89–90, 73 S.Ct. at 140–41. In addition, the complexity of Reed's situation emphasizes the difficulty of undertaking such an inquiry in an asylum state. *California,* 482 U.S. at 417, 107 S.Ct. at 2443 (Stevens, J., dissenting) ("[A]n asylum state court's inquiry may not reach the merits of issues that could be fully litigated in the charging State; such examinations entangle the asylum State's judicial system in laws with which it is unfamiliar and endanger the summary nature of extradition proceedings."). In short, Reed's "self-help" cannot provide him with a remedy in a sister state that is otherwise unavailable. *Sweeney,* 344 U.S. at 89–90, 73 S.Ct. at 140–41. The Extradition Clause, as interpreted by the U.S. Supreme Court, serves as a barrier to an asylum state's review of the past conduct of the demanding state and prevents speculation about future misconduct. *Cf. Sweeney,* 344 U.S. at 91, 73 S.Ct. at 141 (Frankfurter, J., concurring) ("We cannot assume unlawful action of the prison officials which would prevent the petitioner from invoking the aid of the local courts nor readily open the door to such a claim. Our federal system presupposes confidence that a demanding State will not exploit the action of an asylum state by indulging in outlawed conduct to a returned fugitive from justice.") (citation omitted).

139. New Mexico simply lacks authority in our federal system of government to intercede on Reed's behalf in an extradition proceeding for alleged potential violations of his right to due process of law by another state. The Supremacy Clause prevents us from applying New Mexico constitutional protections of due process and of seeking safety in violation of the U.S. Supreme Court's interpretation of the Extradition Clause and its implementing legislation. U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). Thus, the majority's reliance on New Mexico's protection of "seeking and obtaining safety," NM Const. art. II, § 4, even if this provision contains a substantive protection, is misplaced in an extradition proceeding. The majority states that "Reed came to New Mexico explicitly for the purpose of 'seeking and obtaining safety,'" Majority Opinion, ¶ 105, and the district court noted that Reed "wanted to seek sanctuary" in New Mexico. *Reed v. Ortiz*, No. 94–1 CR Misc., 1995 WL 118952, at *6–7 (N.M.Dist.Ct. Jan. 20, 1995). These statements clarify the issue involved; Reed does not contest, at least primarily, the technical validity of Ohio's request for extradition, but rather, he desires political asylum in a sister state from alleged constitutional abuses or potential abuses by Ohio. This is precisely the type of conflict between states that the Extradition Clause seeks to prevent. *See Doran*, 439 U.S. at 287, 99 S.Ct. at 534.

140. As "Great" a writ as habeas corpus is, we may not issue the writ in excess of our authority. *See Sweeney*, 344 U.S. at 90, 73 S.Ct. at 140. Our powers as a sovereign state are not unlimited, and we may not ignore the restraints imposed by the federal Constitution. Even though the majority concludes that Reed is not a fugitive, because of Ohio's actions precipitating his flight from Ohio, I am not persuaded we can review the constitutionality or propriety of Ohio's actions without exceeding New Mexico's authority *in extradition matters*.

## II.

141. Nonetheless, under the facts presented, I would not allow Reed to be extradited to Ohio. Under *Doran*, the demanding state must demonstrate to the asylum state that there is probable cause for the arrest of the accused.

> The magistrate or justice of the peace before whom the criminal charge is filed must issue an arrest warrant if it is determined that there is reasonable cause to believe that an offense has been committed. The inquiry the judicial officer is required to make is directed at the traditional determination of reasonable grounds or probable cause.

*Doran*, 439 U.S. at 289, 99 S.Ct. at 535 (footnote omitted). In fact, the holding in *Doran* was partially based on the judicial determination "that there was 'reasonable cause to believe that such offense(s) were committed and that the accused committed them.'" *Doran*, 439 U.S. at 289, 99 S.Ct. at 535.

142. The usage of "probable cause" clearly suggests the influence of the Fourth Amendment in the Supreme Court's analysis. *Doran*, 439 U.S. at 294–296, 99 S.Ct. at 538–539 (Blackmun, J., concurring); *Brown v. Nutsch*, 619 F.2d 758, 763 n. 6 (8th Cir.1980) (stating that the probable cause requirement "may be founded in the Fourth Amendment, as well as in the Extradition Clause and statute"); *cf. Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975) (requiring "a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest" under the Fourth Amendment). "The extradition process involves an 'extended restraint of liberty following arrest' even more severe than that accompanying detention within a single state." *Doran*, 439 U.S. at 296, 99 S.Ct. at 539 (Blackmun, J., concurring). Therefore, asylum states have a duty to ensure that probable cause exists in order to justify the restraint on the accused's liberty. *See Crew v. State*, 40 Conn.Supp. 179, 486 A.2d 664, 666 (1984) ("When the liberty of a person is being infringed upon when he is forcibly

removed from one state to another, a judicial finding of probable cause is demanded.").

143. Although parolees do not enjoy the absolute liberty of a criminal defendant not yet convicted, the U.S. Supreme Court has found a conditional liberty not to be re-institutionalized unless the parolee violates the conditions of parole. *See Morrissey*, 408 U.S. at 480–82, 92 S.Ct. at 2599–2601 ("By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment."). The Supreme Court found significant state and societal interests in "restoring [the parolee] to normal and useful life within the law" and determined that arbitrary parole revocation constituted a serious impediment to such a goal. *Morrissey*, 408 U.S. at 483–84, 92 S.Ct. at 2601–02. As a result, the Supreme Court found a constitutional right to a preliminary hearing to determine whether probable cause

exists to believe the parolee violated the conditions of parole in order to justify extended incarceration pending a final parole revocation hearing. *See Morrissey*, 408 U.S. at 485–86, 92 S.Ct. at 2602–03; *accord Young v. Harper*, 520 U.S. 143, —— ——, 117 S.Ct. 1148, 1151–54, 137 L.Ed.2d 270 (1997) (concluding that preparole is sufficiently similar to parole to require the protections articulated in *Morrissey*).

144. While a parolee may be temporarily detained prior to the preliminary hearing, *see Moody*, 429 U.S. at 85–89, 97 S.Ct. at 277–80, the Fourteenth Amendment requires a finding of probable cause in order to justify prolonged or substantial confinement. *Morrissey*, 408 U.S. at 487, 92 S.Ct. at 2603 ("Such a determination would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision.").[1] Thus, for

---

1. It might be suggested that there should be a presumptive inference of probable cause based on the subsequent conviction of a parolee or the presence alone of a parolee in the asylum state without permission. *See Morrissey*, 408 U.S. at 490, 92 S.Ct. at 2604 ("[A] parolee cannot relitigate issues determined against him in other forums, as in the situation presented when the revocation is based on conviction of another crime."); *Barton v. Malley*, 626 F.2d 151, 159 (10th Cir.1980) (finding presence in another state without permission sufficient probable cause to believe parolee violated parole such that a preliminary hearing was not constitutionally required). Under such a notion, the Due Process Clause would not require a preliminary hearing for a determination of probable cause.

Under the conditional liberty addressed in *Morrissey*, this position has merit. However, Ohio requires a preliminary hearing to determine probable cause in Reed's situation. Ohio Admin. Code § 5120:1-1-18 (1979, prior to 1995 amendment). Further, in this hearing, Reed would be entitled to present relevant witnesses and documentary evidence, to be represented by counsel, to confront witnesses, and to present mitigating factors. *See* Section 5120:1-1-18(A); § 5120:1-1-18(H). Because Ohio would not presume probable cause and would grant a hearing on the merits for a determination of probable cause, Reed's increased level of conditional liberty as established by Ohio constitutionally may require a preliminary hearing for a determination of probable cause. *Cf. Sandin v. Conner*, 515 U.S. 472, 483, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995) (stating that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause" and that such state actions are "generally limited to freedom from restraint"); *Garcia v. Las Vegas Medi-*

*cal Center*, 112 N.M. 441, 443–45, 816 P.2d 510, 512–14 (Ct.App.1991) (discussing the effect of state law on the requirements of procedural due process under the Fourteenth Amendment and concluding that procedural protections are wholly federal, while substantive interests established by state law may demand greater procedural protection by the Fourteenth Amendment); *see also Brooks v. Shanks*, 1994 NMSC 113, 118 N.M. 716, 720, 885 P.2d 637, 641 ("A state may create a liberty interest by establishing procedures that control how a deprivation of rights or privileges such as good-time credits may be imposed.") (citing *Wolff v. McDonnell*, 418 U.S. 539, 546, 94 S.Ct. 2963, 2969, 41 L.Ed.2d 935 (1974)); *State v. Chavez*, 94 N.M. 102, 103–05, 607 P.2d 640, 641–43 (Ct.App.1979). "State law is relevant only insofar as federal rights are dependent on state law," *Garcia*, 112 N.M. at 444, 816 P.2d at 513, and the conditional liberty of a parolee is entirely dependent on the limits of parole imposed by state law. *Cf. DeLaurentis v. New Haven*, 220 Conn. 225, 597 A.2d 807, 821 (1991) ("[A]n underlying conviction is recognized in this state as conclusive proof that there was probable cause for charges *unless it is proven that the conviction was obtained through fraud, duress, or other unlawful means*.") (emphasis added). In light of the ambiguity of the federal constitutional requirements for the protection of Reed's conditional liberty, New Mexico should not be required to make an inference Ohio itself would not make. *See Morrissey*, 408 U.S. at 481, 92 S.Ct. at 2600 ("[D]ue process is flexible and calls for such procedural protections the particular situation demands.").

This result is not changed by Ohio Rev. Code Ann., Section 2967.15(B) (Banks–Baldwin 1994). Under Section 2967.15(B), a parolee who is con-

purposes of extradition for a parolee, a clear example of an "extended restraint" of a parolee's conditional liberty, an asylum state must confirm that the demanding state has made a determination of probable cause for a parole violation. However, due to the nature of parole and the lesser protection of conditional liberty, the probable cause determination need not be made by a judicial officer. Rather, in accordance with *Morrissey*, a neutral administrative authority may find probable cause after an informal hearing about which the accused is entitled to notice and in which there must be an opportunity for the accused to present evidence and confront witnesses. *Morrissey*, 408 U.S. at 485–87, 92 S.Ct. at 2602–03. If the demanding state has made such a determination, then "the courts of the asylum state are without power to review the determination." *Doran*, 439 U.S. at 290, 99 S.Ct. at 536. However, "the asylum state need not grant extradition unless that determination has been made. The demanding state, of course, has the burden of so demonstrating." *Doran*, 439 U.S. at 296, 99 S.Ct. at 539 (Blackmun, J., concurring).

145. Unlike the factual issue of fugitivity, *Parks v. Bourbeau*, 193 Conn. 270, 477 A.2d 636, 641 n. 9 (1984) ("The inquiry whether a plaintiff is a fugitive from justice is one of fact which is to be resolved by the governor of the asylum state."), the issue of whether a determination of probable cause has been made by the demanding state is a question of law. *Roberts v. Reilly*, 116 U.S. 80, 95, 6 S.Ct. 291, 299, 29 L.Ed. 544 (1885) (stating that the issue of fugitivity is one of fact while that of charging is one of law "and is always open upon the face of the papers to judicial inquiry, on application for a discharge under a writ of habeas corpus."); *Parks*, 477 A.2d at 640–41 ("[T]he requisite that one must be 'substantially charged' requires that the charge be based upon 'probable cause' [and] ... is [a question] of law."). As a result, the district court's determination that probable cause existed as to the parole violation will be reviewed de novo. *See Duncan v. Kerby*, 1993 NMSC 011, 115 N.M. 344, 347–48, 851 P.2d 466, 469–70 (applying this standard to the review of a lower court's grant or denial of a writ of habeas corpus). The district court's conclusion that Reed had been substantially charged with a crime in Ohio did not include a finding of any determination of probable cause. *Reed v. Ortiz*, No. 94–1 CR Misc., 1995 WL 118952, at *4 (N.M.Dist.Ct. Jan. 20, 1995). In addition, the district court did not address whether Ohio had conducted a preliminary hearing in accordance with *Morrissey*. Under de novo review, the district court's finding cannot withstand scrutiny.

146. Ohio has not carried its burden of demonstrating that it made a determination that probable cause existed to believe that Reed violated the conditions of his parole. According to the record, "[t]he Superintendent of Parole Supervision ... brought information to the attention of the Adult Parole Authority that [Reed] has violated the terms and conditions of his parole...." Special Minutes of the State of Ohio Adult Parole Authority, March 23, 1993. In addition, Reed "*will be charged* with absconding supervision, failing to follow instructions of pa-

victed of a crime while on parole is not entitled to a preliminary hearing. However, Reed's Kentucky conviction is not controlled by this statute for two reasons. First, although the Ohio statute is substantially similar to provisions held to be constitutional, *see Kellogg v. Shoemaker*, 46 F.3d at 508–09, this provision does not apply to Reed, in light of the *Ex Post Facto* Clause, U.S. Const. art. I, § 10, because he was convicted of his initial crime before October 6, 1994, the effective date of the statute. *See Kellogg*, 46 F.3d at 509–10 (holding the application of a similar rule of the Ohio Adult Parole Authority to violate the principles of ex post facto for those convicted of the initial crime before September 1, 1992, the effective date of the rule); Ohio Rev.Code Ann. § 2967.021 (Banks–Baldwin 1996) (discussing applicability of 1996 amendments).

Second, Reed had not been convicted of the Kentucky offense at the time he was told to report to be arrested and, subsequently, declared to be a parole violator. As a result, Reed would have been entitled to a preliminary hearing on the matter in Ohio had he not fled the state. *See* Ohio Admin. Code § 5120:1–1–18(G)(1)(c) (requiring a probable cause hearing for one charged but not yet convicted of a new crime if the parolee has not been given a preliminary hearing on the new charge with notice that it serves as a substitute for a separate probable cause hearing). Therefore, Reed is entitled to a preliminary hearing to determine "whether or not there is probable cause or reasonable grounds to believe that [he] has committed an act which would constitute a violation of the conditions of release...." Section 5120:1–1–18(A).

role officer, leaving the state without prior written permission, failing to report his arrest, and involving himself in further criminal activity." Jill D. Goldhart Aff. (October 3, 1994) (emphasis added). There is neither an explicit finding of probable cause nor sufficient information provided to show that a probable cause determination has been made.[2] In fact, the future tense used by the Ohio officials necessarily implies that there has been no such determination. In any case, for parolees, the determination of probable cause must be made in a preliminary hearing, and Ohio's documentation demonstrates that there has been no hearing. Jill D. Goldhart Aff. (October 3, 1994) ("Reed will be returned to Ohio for a parole violation onsite hearing.").

### III.

147. In response to Ohio's failure to make a probable cause determination, I would normally favor a remand to the district court to make this determination independently before allowing the extradition of a parolee, see *Ex Parte Sanchez*, 642 S.W.2d 809, 811–12 (Tex.Crim.App.1982) ("[W]e find no prohibition in *Michigan v. Doran* ... that would preclude a neutral judicial officer of this State from making this [probable cause] determination."), or a denial of extradition pending Ohio's determination of probable cause. However, I believe the length of time Reed was incarcerated without a preliminary hearing violates the requirement of holding a probable cause hearing "as promptly as convenient after arrest while information is fresh and sources are available." *Morrissey*, 408 U.S. at 485, 92 S.Ct. at 2602. Therefore, I would affirm the district court's grant of the writ of habeas corpus and deny extradition to Ohio.

148. Many courts have interpreted the promptness requirement contained in *Morrissey*, including the courts of Ohio. Some courts have interpreted *Morrissey* as setting a maximum number of days within which the hearing must be held. *See, e.g., Luther v. Molina*, 627 F.2d 71, 74–75 n. 3 (7th Cir. 1980) ("Chief Justice Burger seemed to be contemplating an almost immediate hearing; ... It is possible that a ten day delay between detention and the preliminary hearing does not meet ... constitutional requirements."); *Gawron v. Roberts*, 113 Idaho 330, 743 P.2d 983, 988–89 (App.1987) (applying the forty-eight-hour statutory requirement from the area of arrest as an analogy for interpreting the timeliness requirement of *Morrissey*); *see also Hanahan v. Luther*, 693 F.2d 629, 634 (7th Cir.1982) ("Three months has been mentioned in some cases as the outside limit of reasonableness."). Other courts, relying on an analogy between a prompt hearing and a speedy trial, have applied the speedy trial balancing test articulated by the U.S. Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *E.g., Hanahan*, 693 F.2d at 634; *Seebeck v. Zent*, 68 Ohio St.3d 109, 623 N.E.2d 1195, 1197 (1993); *Butenhoff v. Oberquell*, 25 Wash.App. 149, 603 P.2d 1277, 1280 (1979). There are two relevant factors under the balancing test: (1) a court must determine the reasonableness of the delay based on the length of incarceration without a preliminary hearing, the reasons for the delay, and whether the parolee asserted the right to a timely hearing; and (2) a court must determine the prejudice to the parolee caused by the delay based on the policy of preventing oppressive prehearing incarceration, the minimization of anxiety of the parolee, and the potential impairment of the parolee's defense to the alleged violation

---

**2.** Because the documents neither explicitly nor implicitly demonstrate a finding of probable cause, the question of whether the documents must facially show a finding of probable cause need not be addressed. *See Doran*, 439 U.S. at 296, 99 S.Ct. at 539 (Blackmun, J., concurring) ("It is enough if the papers submitted by the demanding state in support of its request for extradition *facially* show that a neutral magistrate has made a finding of probable cause."); *compare Crew v. State*, 40 Conn.Supp. 179, 486

A.2d 664, 666 (1984) ("Inferences ... are not sufficient. A judge should explicitly make the finding, not only to assure that he has focused on that requirement, but also so that the asylum state will know that the finding has been affirmatively made."), *with White v. King County*, 109 Wash.2d 777, 748 P.2d 616, 620–21 (1988) (inferring a finding of probable cause from an arrest warrant based on the statutory requirement of such for the issuance of a warrant), *and In re Whitehouse*, 18 Mass.App.Ct. 455, 467 N.E.2d 228, 230–31 (1984) (same).

of parole. *See Seebeck,* 623 N.E.2d at 1197; *see also State v. Manzanares,* 1996 NMSC 028, 121 N.M. 798, 800–801, 918 P.2d 714, 716–17 (discussing the *Barker* analysis).

149. According to the record, Reed was arrested on October 27, 1994, and he was incarcerated in New Mexico without a preliminary hearing until the district court's ruling on January 20, 1995, a period of almost three months. While a delay during the period of three days before Reed asserted his habeas corpus rights may have been reasonable in anticipation of a voluntary return, Ohio did not have a justifiable reason for keeping Reed incarcerated for two and one half months without a preliminary hearing during the habeas proceeding. Ohio could easily have provided notice to Reed of a hearing in Ohio and counsel at the hearing on his behalf. In addition, Reed asserted in the district court that Ohio had refused to give him a preliminary hearing, thereby notifying Ohio of his request for such a proceeding. It is doubtful that a delay damaged Reed's defense considering the much more lengthy delay attributable to his voluntary behavior of leaving Ohio. However, Reed still suffered prejudice in such a lengthy, oppressive prehearing incarceration and from the heightened anxiety due to the alleged misconduct of the Ohio officials and his concern about future physical abuse. In Reed's case, this delay was both unreasonable and prejudicial. Thus, Ohio could not now constitutionally hold a preliminary hearing for a probable cause determination. *See Flenoy v. Ohio Adult Parole Authority,* 56 Ohio St.3d 131, 564 N.E.2d 1060, 1063 (1990) ("If an unreasonably long period went by before a hearing either was granted or became necessary, the APA lost its right to revoke ... parole."); *see also Butenhoff,* 603 P.2d at 1280 (reversing a parole revocation for an untimely hearing and reinstating parole). Therefore, I would affirm the district court.

## IV.

150. I believe the analysis on which the majority opinion relies exceeds the limits imposed on our powers as an asylum state under the Extradition Clause of the U.S. Constitution. The U.S. Supreme Court has limited habeas corpus review in extradition proceedings to a narrow inquiry which includes neither substantive defenses nor a broad definition of fugitivity. Nonetheless, Reed, as a parolee, has a conditional liberty not to be incarcerated without probable cause, and Ohio must demonstrate a finding of probable cause in order to justify the extended restraint on Reed's liberty involved in the extradition process. Because Ohio has not demonstrated a finding of probable cause and could not now hold a preliminary hearing, I would affirm the district court's grant of the writ of habeas corpus.

BACA, Justice (Dissenting).

While I am mindful of Appellee Reed's situation, I must respectfully dissent from the majority's decision upholding the actions of the district court. The analysis employed by the majority expands the powers of an asylum state beyond permissible boundaries in violation of the limitations established by the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, and the Supreme Law of the Land Clause in the New Mexico Constitution, NM Const. Art. II, § 2.

The United States Supreme Court has minimized the scope of inquiry available to asylum states in the context of a request for extradition. *California v. Superior Court,* 482 U.S. 400, 402, 107 S.Ct. 2433, 2435, 96 L.Ed.2d 332 (1987). Under these guidelines, an asylum state can do no more than decide whether the requirements of the Extradition Act have been met. *Id.* at 408, 107 S.Ct. at 2438; *see also Michigan v. Doran,* 439 U.S. 282, 289, 99 S.Ct. 530, 535, 58 L.Ed.2d 521 (1978) (holding that habeas corpus proceedings challenging extradition are limited to set criteria for inquiry: existence of a crime charged against a defendant, technical compliance with required documentation, concurrence of identity between the defendant and the person sought for extradition, and fugitivity).

The majority opinion focuses on the notion of "fugitivity from justice," *see Doran,* 439 U.S. at 289, 99 S.Ct. at 535, and emphasizes the allegedly unfair circumstances from which Reed seeks asylum. However, the

majority overlooks that the fugitivity inquiry permitted by asylum states is a very narrow one. "[T]o be a fugitive from justice, it is necessary 'that having within a state committed that which by its laws constitutes a crime, when he is sought to be subjected to its criminal process to answer for his offence [sic], he has left its jurisdiction and is found within the territory of another.'" *California*, 482 U.S. at 419, 107 S.Ct. at 2444 (Stevens, J., dissenting) (quoting *Roberts v. Reilly*, 116 U.S. 80, 97, 6 S.Ct. 291, 300, 29 L.Ed. 544 (1885)). Thus, the term "fugitivity from justice" is very limited in scope and was not intended for the purposes of permitting an asylum state to question the fairness of a demanding state's actions.

The majority ignores the policy dangers inherent in its holding. In *Doran*, the U.S. Supreme Court narrowed the scope of habeas corpus review so that the principles embodied in the Extradition Clause would be protected. In that case, the Court held that it wished to prevent "any state from becoming a sanctuary for fugitives from justice of another state and thus 'balkaniz[ing]' the administration of criminal justice among the several states." *Doran*, 439 U.S. at 287, 99 S.Ct. at 534. I believe the majority's holding presents precisely such a danger.

Furthermore, this Court's holding will make New Mexico a haven for those seeking asylum and fleeing from what they deem as unjust treatment by other states' courts. Such a scenario is troubling first because it leaves New Mexico courts in the awkward position of construing another state's law, requiring New Mexico courts to analyze statutes and procedures with which they are unfamiliar. In addition, the majority's holding invites adjudication of the merits of a demanding state's actions in an asylum state's forum where often there is no one available to answer on behalf of the demanding state. *See Sweeney v. Woodall*, 344 U.S. 86, 90, 73 S.Ct. 139, 140, 97 L.Ed. 114 (1952). For these reasons, the Supreme Court has rejected this type of interstate asylum "self-help," holding that flight from a demanding state neither weakens the demanding state's authority to review accusations of official misconduct, nor creates authority in the asy-

lum state to review the actions of those officials. *Id.* at 89–90, 73 S.Ct. at 140–41. Stated simply, New Mexico does not possess the authority in our federal system of government to intercede on Reed's behalf in this extradition proceeding for alleged violations of his right to due process by another state. U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.")

While noting the aforementioned arguments in her special concurrence, Justice Minzner points out that Ohio failed to grant Reed a hearing on probable cause, suggesting that Reed's due process concerns might have been cured had a hearing been granted in Ohio. However, the fact that Ohio could have set such a hearing does not provide a basis for upholding the actions of the trial court. First and foremost, as noted by a substantial body of U.S. Supreme Court precedent, New Mexico does not have the authority to adjudicate whether or not Ohio provided Reed with fair proceedings in this case. That is a question for the courts of Ohio or for the federal appellate avenues available to Reed upon exhaustion of his remedies in Ohio. Furthermore, I question the practicality of asserting that Ohio might have handled the situation by setting a probable cause hearing. It is clear that even if such a hearing had been set, Reed would have been unwilling to submit himself to the laws of Ohio voluntarily for the purposes of representing himself.

For these reasons, I respectfully DISSENT.